Kelly, Shuttleworth & McManus, Appellants, v. Central National Bank & Trust Company of Des Moines, Appellee; First National Bank of Perry et al., Intervenors, Appellants.

No. 41320.

April 4, 1933.

726

Carr, Cox, Evans & Riley, for appellant.

Nourse & Nourse, for appellee.

Brammer, Brody, Charlton & Parker, for intervenors.

MITCHELL, J.—The law firm of Miller, Kelly, Shuttleworth & McManus was employed some time shortly before June 19, 1925, by the First National Bank of Perry, Iowa, and other parties, for the purpose of attempting to effect a realization on Union Mortgage Company bonds issued under a trust indenture naming and appointing the Central State Bank of Des Moines as trustee. The record shows that at the time of the employment of the said law firm, there was no agreement in regard to compensation which it was to receive for the services rendered. In December, 1928, Messrs. Kelly, Shuttleworth & McManus severed their connection with the firm of Miller, Kelly, Shuttleworth & McManus, and in the dissolution, Kelly, Shuttleworth & McManus took over the case against the Central State Bank, and whatever fees had theretofore been earned therein became the property of Kelly, Shuttleworth & McManus.

We shall in this opinion refer to Kelly, Shuttleworth & McManus as appellant, and to the intervenors, who also have appealed, simply as the intervenors.

The appellant commenced an action on behalf of their clients,

the six bondholders, against the Union Mortgage Company. This action was commenced in the district court of Polk county, Iowa, and the title of the action was Richardson v. Union Mortgage Company. It was a suit to recover upon bonds issued by the Union Mortgage Company, which bonds were secured by collateral deposited with the Central State Bank of Des Moines as trustee. Later the Central National Bank was made one of the defendants. The Union Mortgage Company was insolvent, in fact, was not a going concern at the time of the employment of the appellant firm, and recovery was sought and ultimately obtained against the Central National Bank on account of the violation by it of the terms of the indenture under which it, as trustee, held the mortgages as collateral security for the payment of the bonds. On the 10th day of October, 1928, the Polk county district court entered an order finding against the bondholders, and in favor of the Central State Bank. The appellant firm perfected an appeal to the supreme court and submitted the case in the supreme court, where it was reversed and judgment entered against the trustee bank in the sum of $54,108.42. The opinion in the case is reported in the reports of this court, 210 Iowa, page 346, 228 N. W. 103. Richardson and the intervenors in that suit are the intervenors here. The record shows that during the process of the litigation the Central State Bank was merged with the Central National Bank and the Central National Bank became the defendant in that action.

On the 14th day of May, 1930, following the decision of the supreme court in the case of Richardson v. Union Mortgage Company, the Central National Bank & Trust Company paid the costs in the case and issued cashier's checks, six in number, payable to Kelly, Shuttleworth & McManus, as attorneys for each one of the various intervenors in that case, for the amount due to each intervenor. On the 15th day of May, 1930, Mr. Clyde E. Brenton, then vice president of the First National Bank of Perry, and agent for the intervenors in the case of Richardson v. Union Mortgage Company, in some manner not disclosed in the record, secured possession of the checks which the Central National Bank & Trust Company had issued, and delivered to the firm of Kelly, Shuttleworth & McManus. Brenton delivered the unindorsed checks to the Central National Bank & Trust Company and requested that checks in like amounts be issued in the names of the beneficiaries, rather than in the name of the appellant firm. In accordance with the request, a second

series of checks was issued and delivered to Mr. Clyde E. Brenton on May 15, 1930. On the same day, and shortly thereafter, Kelly, Shuttleworth & McManus served on the Central National Bank written notice of claim of attorney's lien upon the original cashier's checks and the proceeds thereof in the amount of $20,000. On the same day, to wit, May 15, 1930, the Central National Bank refused to pay to Kelly, Shuttleworth & McManus the amount of the face of the checks and the appellant, on May 16, 1930, commenced this litigation by filing a petition at law against the Central National Bank & Trust Company, in the amount of $54,108.42, together with interest and costs. Twelve days later each intervenor filed in the case at bar, and in Richardson v. Union Mortgage Company, attorney's fee bond, signed by the intervenor, as principal, and Clyde E. Brenton, as surety. Six days after the filing of the attorney's fee bond the intervenors filed petitions of intervention pleading the delivery and filing of the bonds, asserting ownership by the intervenors of the obligation sued upon by appellant, denying any right or interest of appellant therein, and asking for the amount of the cashier's checks and for interest.

The Central National Bank then filed its answer and bill of interpleader against the appellant and the intervenors, alleging that the two sets of checks had been issued for the same debt; that the two sets or series, it was claimed, had been wrongfully obtained by Clyde E. Brenton on the ground that he was the rightful holder of the first set or series of checks, issued to appellant as attorneys; and that the Central National Bank had always been ready, willing, and able to pay the debt, and tendered payment and so held the fund ready for payment, and asked that the cause be transferred to equity for the purpose of trying the issues arising upon the bill of interpleader. The intervenors filed an answer to the cross-petition of the Central National Bank and denied that the appellant had any right, lien, or interest in and to said fund now held by the Central National Bank, and especially denied that any controversy cognizable in equity existed between appellant and the intervenors as to the amount of the attorney's fee and lien, but without waiving or in any manner relinquishing intervenors' several rights to jury trial at law of any controversy as between intervenors and appellant with respect to said fund, intervenors consent that transfer of this cause to the equity docket be made for the purpose of adjudication as to the amount owing by the Central National Bank, and for the purpose of

permitting exoneration of the Central National Bank upon payment to the clerk of the district court of such fund for the benefit of such claimants thereof as shall, in any appropriate proceedings thereafter had, be held entitled to recover the same. The appellant joined with the Central National Bank in asking for the transfer to equity. Afterward, on the 29th day of November, 1930, the intervenors, by an amendment to their answer to the Central National Bank's cross-bill, attempted to withdraw their consent to the transfer to equity as set out in their answer to the cross-petition of the Central National Bank. The intervenors then replied to the answer of appellant to appellee's petition of intervention, reasserting that any lien which the appellant has or may claim to have for services rendered has been divested by the bond mentioned in the petition of intervention herein, which bond was executed, posted, and delivered as required by law. The reply of the intervenors also alleges that one E. J. Kelly, for and in behalf of the appellant, agreed with the intervenors that in the event the suit entitled Richardson v. Union Mortgage Company et al., and known as Equity No. 4245, was won in the Supreme Court of Iowa, the appellant firm would accept in full payment of all services rendered in connection therewith for the various intervenors the sum of $2,000, which sum would be apportioned among the said several clients of the appellant in proportion to their claims, and that the appellant had been paid the sum of $250 and the only sum appellant was entitled to was the sum of $1,750, which amount was tendered to the appellant and refused by it.

The court entered an order transferring the case to the equity side of the calendar and said cause was tried as an equity action. The intervenors also in their petition of intervention demanded judgment for $54,108.42 against the Central National Bank & Trust Company, and for interest at 6 per cent, from May 15, 1930, asserting the ownership of the obligations. The Central National Bank & Trust Company answered the petition of intervention admitting the obligation to pay the amount claimed, but denying any obligation to pay interest on said sum, and cross-petitioned asking to transfer the cause to equity for determination by the equity court of the rights of the respective parties in respect to the obligation of $54,-108.42. The trial court rendered judgment against the Central National Bank & Trust Company only in the amount of its admitted liability, to wit, $54,108.42, and held the bank not liable for any

damages for breach of contract or for any interest for the period which elapsed between the accrual of the original obligation and the determination of the ensuing obligation. From this part of the decree the intervenors have appealed. The trial court also held that the appellant was entitled to the sum of $2,000 for the services rendered as attorneys in the Richardson case, and for interest on said amount. From the finding and decree of the lower court in regard to the amount of attorney's fees to which they were entitled the appellants have appealed.

The first question which confronts this court is whether or not there was an agreement entered into between the appellant firm Kelly, Shuttleworth & McManus, and the intervenors, through their agent, Clyde E. Brenton, that the compensation to which the appellant firm would be entitled if the case of Richardson v. Central National Bank was reversed in the Supreme Court and judgment entered for the intervenors, would be limited to $2,000. That issue was presented by reply of the intervenors in which it was alleged that "one E. J. Kelly, for and in behalf of the plaintiff, agreed with these intervenors that in the event the suit entitled Richardson v. Union Mortgage Company et al., known as Equity No. 4245, was won in the supreme court of Iowa, the plaintiff would accept in full payment of his services in connection therewith the sum of $2,000, which sum would be apportioned among the said * * * "

There is no dispute in this case but that the appellant firm was employed by the intervenors in what we shall hereafter call the Richardson case, and represented the intervenors in said case, and that at the time that the said appellant firm was employed there was no arrangement or agreement in regard to compensation for services rendered by the said appellant firm. The appellant firm proceeded to investigate the facts and the record clearly shows that it took considerable time and skill to uncover the facts. The appellant firm commenced the action and tried the case in the lower court, where a decree was entered adversely to the intervenors in the said Richardson case, being the parties represented by the appellant. It is the claim of the intervenors that after the Richardson case was lost in the lower court, E. J. Kelly, who was at the time a member of the firm of Kelly, Shuttleworth & McManus, had a conference with Clyde E. Brenton, who was then vice president of the First National Bank of Perry, one of the bondholders, and who was also the agent of the five other bondholders. This conference took place

on or about the 15th day of November, 1928. E. J. Kelly, the person with whom Brenton had the conference, and a member of the appellant firm, died some time prior to the trial of this case. Brenton, over proper objection, testified as follows:

"I had a conversation with Mr. Kelly concerning this case on or about the 15th day of November, 1928. The conference was in the office of Mr. Louis C. Kurtz at the Des Moines National Bank. Mr. Kelly and Mr. Kurtz and myself were present. * * * Mr. Kelly and I stood up and Mr. Kelly says, 'what about the appeal of the Union Mortgage and Central State Bank?' He says, 'It ought to be appealed, and I can reverse the decision.' I asked him what the expense would be. He said '$500.00—I will carry it up for $500.00 as full compensation for the lower court work, and the appeal if I lose.' I says, 'How much if you win?' and he hesitated and and I says '$2000.00' and he says, 'Yes.' "

The appellant objected to this testimony under the "dead man statute." At the time this conversation was had Mr. Brenton was an officer and stockholder of the First National Bank of Perry, Iowa, one of the intervenors. Brenton was the party who represented all the intervenors in making the alleged contract. In addition to this, he had, as surety, executed bonds which were filed by each of the intervenors to release any attorney's lien which the appellant might have and which bonds constituted a promise to pay any amount that might finally be found due to Kelly, Shuttleworth & McManus as compensation for services in the Richardson case. Brenton had, however, during the time the case was pending and before trial, sold his stock in the said First National Bank of Perry, Iowa, to a close relative, obviously upon the advice of counsel, for the purpose of attempting to qualify himself as a witness. We do not need to pass upon the question here as to whether the sale and the transfer of the stock could qualify him as a witness, for he still was a surety on the attorney's lien bonds, and was interested in the outcome of this suit, which as finally submitted, was one to determine the amount of appellant's compensation, which he, as surety on said bond, agreed to pay. The amount for which Brenton would be liable was to be determined and was determined in this suit. His interest was direct. His liability upon said bonds, as well as the amount of them, is to be determined by the ultimate outcome of this suit. The language of the bond is:

"That if the obligors or either of them shall pay or cause to be paid to the above named Kelly, Shuttleworth & McManus any amount finally found due for services rendered as attorney for * * * then this obligation shall be void. Otherwise to remain in full force and effect."

He was undertaking to testify to a transaction which, if adopted by the court, would have the effect of limiting his aggregate liability on the six bonds to the sum of $2,000. He undertook, therefore, to testify to a personal transaction with the deceased against his surviving partners that involved the very subject-matter of his liability upon the bonds. This, it seems to us, comes clearly within the prohibition of section 11257 of the 1931 Code of Iowa, commonly known as the "dead man statute." Brenton was not a competent witness, unless the fact that this suit is against the surviving members of the partnership of which Kelly was a member avoids the operation of the statute prohibiting testimony by persons interested in the event of a suit as to personal transactions with parties deceased in actions against their survivors.

This court, in the case of Salyers v. Monroe, 104 Iowa 74, 73 N. W. 606, said:

"A surviving partner is within both the letter and the spirit of the statute. As he cannot have the benefit of the testimony of his deceased partner as to what the conversation really was, he should not be made liable on the testimony of his adversary respecting it. Since the mouth of one of the parties to the conversation is closed by death, the law compels the other to remain silent. The fact that the representative of the deceased partner was not a party to the action is immaterial."

As Brenton was a surety upon the bond he was attempting to testify to something that would limit his liability. It was a personal transaction between Brenton and Kelly that involved the very subject-matter of his liability upon said bonds, and, therefore, he was not a competent witness.

 Excluding this testimony of Brenton, the only other testimony in the record was that of the witness Kurtz, who testified as follows:

"Yes, I recall a conversation between Mr. Brenton and Mr. E. J. Kelly on or about November 15, 1928. The conversation was held

in my office in the Des Moines National Bank. Yes, I think it was in the afternoon. Q. Now will you state, Mr. Kurtz, just what was said by Mr. Kelly and what was said by Mr. Brenton at that time in your presence. A. Well, in the first place we were, three of us, were in my office discussing a matter that Mr. Kelly was handling in which both banks were interested before the consolidation, and when we got through with that Mr. Kelly addressed Mr. Brenton with this remark—'Well, we lost our case in the District Court.' And Mr. Brenton made some reference, we might have settled it. Mr. Kelly said he felt sure we could win the case if it were taken to the Supreme Court. Mr. Brenton wanted to know what the expense would be taking it up to the Supreme Court, and Mr. Kelly said the expense would be $500.00, and Mr. Brenton made the reply, 'All right, give you $500.00 if you lose and $2,000.00 if you win.' Q. Did Mr. Kelly say anything with reference to that statement of Mr. Brenton's? A. Made no remark whatsoever in my presence. Q. Did he shake his head or indicate any remonstrance or protest? A. Mr. Kelly was looking out of the window, I noticed the expression on his face, he was pinching his lips, and I thought it was a matter I was not interested in, possibly they wanted to discuss it, so I got up and left the office and walked out to my secretary who was right outside the door and said a word or two to her, and then I saw them both walk out together. Q. Was there any further conversation than that you have related you recall at this time? A. No, nothing further."

It is the claim of the interveners here that the testimony of the witness Kurtz shows that there was an offer made by Brenton to Kelly, and that, while there is no evidence of an oral acceptance of said offer, the fact that Kelly and his firm proceeded with the appeal, the doing of the act presented a situation where a unilateral contract could be found to exist because of the statement made by Brenton, which interveners claim was an offer, to which Kurtz testified, and the act of Kelly in prosecuting the appeal, which interveners claim was the acceptance.

We appreciate that under the rules of law laid down in this and other states it is held that where services are performed in response to an offer made by another party, the legal inference follows that all the terms of the offer were accepted, unless the party doing the work proves the contrary. The reasonableness of the agreement cannot affect the result. It may be that the work

done and the results obtained may have entitled appellant to a greater remuneration than that offered, but if the offer was made and the work performed in response thereto, then a legal inference arises that an agreement on the part of the one performing the work, and an acceptance of the offer by the other, was had. We do not believe, however, that the situation in the case at bar is one where a unilateral contract can be made to rest merely upon an offer and the doing of an act.

At the time that Brenton and Kelly had the conversation to which Kurtz testified, there existed between Kelly and the parties that Brenton represented a contractual relationship. Kelly had been employed to investigate and to prosecute the case for the parties that Brenton represented. He had investigated it. He had tried the case in the lower court and the verdict had been against him. The record shows that an immense amount of work was done in the investigation and the preparation of the case for trial in the lower court. The trial in the lower court consumed considerable time. When Kelly was employed, no agreement was made in regard to the compensation which he was to receive. He was, therefore, entitled to reasonable compensation for services rendered in the matter of the investigation and the trial in the lower court. Brenton had a right to terminate Kelly's employment. He could have discharged Kelly. But he could not, without Kelly's formal consent or formal acceptance of his offer, change the terms of the contract or avoid the liability that already existed for compensation for services already performed. Kurtz does not testify that Brenton made any statement that if Kelly did not accept the $2,000 as full compensation for the appeal and for the services rendered in the lower court he would discharge him or secure some other attorney to try the case. All that Kurtz testifies to is that Brenton said, "We will give you $500 if you lose, and $2,000 if you win." Kurtz says that Kelly did not reply. Kurtz says that he watched Kelly's face to see what his expression would be, and that all he could see was that Kelly was "pinching his lips." Kurtz then left the room. In regard to what took place after he left the room there is no competent evidence in the record. At the time of the conversation between Brenton and Kelly the relationship between the parties was that of attorney and client. The fact that the relationship of attorney and client existed at the time of the conversation, existed at the time that the alleged offer was made, required a communica-

tion of acceptance by Kelly because it was necessary that Kelly promise to waive any compensation for services performed up to that time.

This court said, in Port Huron Mach. Co. v. Wohlers, 207 Iowa 826, at page 830, 221 N. W. 843, 845:

"It must be kept in mind that there is a distinction in regard to communication of acceptance between offers which ask that the offeree *shall* do something, as in the instant case, and offers which ask that the offeree shall *promise something*. In offers of the latter kind communication of the acceptance is always essential."

The interveners in this court are not claiming that the $2,000 compensation was to be accepted solely for the work in the Supreme Court. They claim that it was to be paid as compensation for all services rendered in both courts. This being so, the offer of Brenton to pay $2,000 did not merely ask that Kelly do something, but required him also to waive his right to compensation for services already performed. It was not the making of a contract under circumstances where none existed; it was the modification of an existing contract. The acceptance, therefore, involved more than the mere prosecution of the appeal. It cannot be found from the doing of the act. The offer made under such circumstances required a promise as well as an act and therefore a communication of acceptance was required to effect the making of the contract.

There is the further evidence in the record of the letter written by Kelly on November 17, 1928, which was two days after the conversation between Brenton and Kelly, as follows:

"In the above matter (Richardson v. Union Mortgage Co.) we have had a conference with Mr. Brenton in which he has decided that we should take the above case to the Supreme Court.

"We have ordered a transcript and are today serving notice of appeal. It will take us about a month to get this transcript and we cannot file our abstract until that is received.

"There will be some advance charges and costs to be paid on this matter as it progresses and Mr. Brenton asked us to bill it direct to you. We agreed with him that in the event we lost this suit our charges would be $250.00 in the lower court and $250.00 on appeal. We have, therefore, entered a charge of $250.00 against you for services already rendered and the same appears on the account en-

closed. We are not making any charges against any of the inter-venors.

"Trusting that you will forward us your draft to cover this amount as soon as convenient, I remain."

This letter was written two days after the conversation between Brenton and Kelly. No reference is made to the $2,000 as compensation in the event the appeal should be successful. It indicates that Kelly was proceeding on the theory that if they lost they were to get $500 and if they won, reasonable compensation for his services was to be paid. At the time of the conversation between Brenton and Kelly, Kelly had already investigated the facts and tried the case in the lower court. The record shows without any dispute that there was an immense amount of work performed in the preparation and trial of the case. The amount involved was a large amount, over $54,000. Brenton had prior to this time authorized the settlement of the suit for $10,000. It seems unreasonable that Kelly should have been willing to enter into any agreement in the face of the amount of work already done for which he was entitled to compensation, and the amount involved, to accept a sum of $500 if he lost and $2,000 if he won. There is no claim that the clients, or that Brenton acting for Kelly's clients, attempted to terminate or did terminate in any way the contract that existed between Kelly and the parties interested. We therefore hold that there is not sufficient evidence in the record to prove that there was a contract arrangement entered into between Brenton and Kelly whereby Kelly agreed to accept in case he lost $500, and in case he won $2,000, and that the appellant firm is entitled to reasonable compensation for the services rendered on a quantum meruit basis.

The question now before the court is as to the amount of compensation that the appellant firm is entitled to for the services rendered. In fixing the compensation for attorneys on a quantum meruit basis, there are certain elements that should be taken into consideration. First, the amount involved; second, the character of the question in the case and the standing of the attorneys; third, the time occupied; and, fourth, the result accomplished.

In the case at bar, some of the outstanding attorneys of the state testified in regard to what would be fair compensation for the appellant firm. These attorneys appeared as witnesses for the appellant, and as witnesses for the intervenors. They were all men of

standing at the bar of this state. They were men familiar with the amount of work and the skill required in the investigation and trial and appeal of a case such as the case of Richardson v. Central National Bank. And yet they disagreed very materially in regard to the compensation that the appellant firm would be entitled to on a *quantum meruit* basis. The amounts which they placed the fair compensation at under *quantum meruit* ranged from $3,500 to $15,000. As these distinguished members of the bar varied so greatly in the amount that they believed was fair compensation for the appellant in this case, it is very easy to understand how difficult it is for the court to arrive at an amount that would be fair to the appellant and fair to the intervenors—in other words, the fair and reasonable compensation on a *quantum meruit* basis for the services rendered.

The record shows that the firm of Kelly, Shuttleworth & McManus was composed of men of ability and of the highest reputation in the community as practicing lawyers. The term of employment extended over a period from June, 1925, to May, 1930. During that period of time this matter received attention on a total of 196 days, on which some time was devoted to the case. On many of the days two members of the firm were employed. On some days the entire day was consumed, while on others, nothing more was done than to write a letter or two. In the beginning a careful investigation was made of the case. It was necessary to trace the mortgages which had been placed in trust with the Central Bank as collateral to the bonds that were issued. This involved a great many transactions and a great deal of time. The case was then brought, and as the Union Mortgage Company was insolvent, if there was to be a recovery, it was necessary to secure that recovery against the trustee, the Central National Bank. The case was tried in the lower court, considerable time being consumed in the trial of the case. The decree of the lower court was adverse to the interest of appellant's clients in that case. They then perfected an appeal to the Supreme Court. Elaborate briefs and arguments were submitted by the appellant in support of their contention for a reversal of the case in the Supreme Court. It was orally submitted in the Supreme Court and the verdict of the lower court was reversed. A petition for rehearing was filed by the losing side and the appellant filed a resistance, together with a brief and argument. They were successful in securing this court to refuse to grant a rehearing. The amount

involved was in excess of $54,000. Carefully considering the ability and standing of the appellant firm as lawyers, the time involved, the nature of the action, and the result accomplished, it seems to us that the appellant is entitled to compensation in the amount of $7,500 for its services rendered to the intervenors in the case of Richardson v. Central National Bank, and that, as the sum of $593.10 has already been paid to the appellant, it is entitled to an additional amount of $6,906.90.

The next question is the intervenors' claim for interest upon the funds in the hands of the defendant bank. In its answer the bank interpleaded the other two parties for the purpose of having their rights determined before paying the money to either.

The evidence shows that the appellee was at all times willing and able to pay the amount found due the intervenors. They had already issued two separate sets of checks therefor.

At the conclusion of the other case against them by the present intervenors, they immediately issued checks for $54,108.42 to the appellant as attorneys for said intervenors in full payment and satisfaction of its obligations therein. These checks were returned the same or next day by Mr. Brenton who claimed to be acting as agent for intervenors, and at his request the bank issued new checks to the intervenors direct, and delivered them to Mr. Brenton. Before cashing the second set of checks, they were notified of appellant's claim and attorney's lien against the checks first issued, and the amount due thereon. On refusing to honor them, appellant immediately commenced an action therefor. In appellee's answer both appellant and intervenors were interpleaded. The bank alleged it had always been able and willing to pay its indebtedness to the party entitled thereto, but that because of the conflicting claims of appellant and intervenors they were unable to do so without a double liability, and asked that the rights of both contenders be determined in equity, and that they be authorized to pay the amounts represented by the checks to the parties found entitled thereto by the court and that they be exonerated from any further liability. The case was transferred to equity and the issues therein tried.

"The remedy by interpleader is an equitable one based on the theory that conflicting claimants should litigate the matter among themselves without involving the stakeholder in their dispute. A bill of interpleader is defined to be a bill exhibited where two or

more persons severally claim the same debt, duty, or thing from the complainant under different titles or in separate interest; and he, not claiming any title or interest therein himself, and not knowing to which of the claimants he ought of right. to render the debt or duty, or deliver the property, is either molested by an action brought against him or fears that he may suffer injury from their conflicting claims, and therefore prays that they may be compelled to interplead, and state their several claims so that the court may adjudge to whom the matter or thing in controversy belongs." 33 C. J. 419.

See, also, Story on Equity Jurisprudence, vol. 2, section 806, in which it is said:

"It is observable that the jurisdiction of courts of equity to .compel an interpleader follows to some extent the analogy of the law. It is properly applied where two or more persons severally claim the same thing under different titles or in separate interests from another person, who not claiming any title or interest therein himself, and not knowing to which of the claimants he ought of right to render the debt or duty claimed, or to deliver the property in his custody is either molested by an action or actions brought against him or fears that he may suffer injury from the conflicting claims of the parties. He, therefore, applies to a court of equity to protect him not only from being compelled to pay or deliver the thing to *both* of the claimants, but also from the vexation attending upon these suits which are, or possibly may be instituted against him."

The same rule was followed in Liberty Oil Co. v. Condon Nat. Bank, 260 U. S. 235, 43 S. Ct. 118, 67 L. Ed. 232; Hoyt v. Gouge, 125 Iowa 603, loc. cit. 604, 101 N. W. 464.

In the case at bar, which is an equitable action, a tender was actually made, pleaded, and proved. It was for the court to adjust and protect the rights of all parties, and actual payment of the money into court was not necessary to keep the tender good. There is a distinction in .Iowa between tender at law and tender in equity. Hayward v. Munger, 14 Iowa 516, loc. cit. 522; Martin v. Harper, 193 Iowa 259, loc. cit. 264, 186 N. W. 897. In the Hayward case we said:

"As to the failure to bring the money into court until after the order was made by the referee, we remark, that it has been held

under our statute, in an action *at law*, that the tender must be kept up; and that a plea of tender, unaccompanied by payment of the money into court, is of no avail. * * * The rule is one of very questionable propriety, in view of the provisions of our statute, in a law action. It was so settled, however, as early as 1853, and we have not felt disposed to disturb it. In an equitable proceeding, however, we are unwilling to give it effect."

The appellee, Central National Bank, was at all times able and willing to pay to the parties themselves if they would exonerate the bank. The failure to bring the money into court until after the determination of the issues between the parties in an equitable action, is not sufficient to make the bank liable for interest.

The lower court found that the intervenors were not entitled to interest upon all the funds in the bank's possession.

After the judgment below was rendered, and ·the money paid into court, it was received and accepted by the intervenors. Under the rule in this state, if a party recovering judgment accepts the benefits thereof, he cannot afterward appeal. Independent Dist. of Altoona v. District Tp. of Delaware, 44 Iowa 201; Ballinger v. Conn. Mut. Life Ins. Co., 118 Iowa 23, 91 N. W. 767.

The intervenors received and accepted practically all of the money paid into court under the decree and are, therefore, not entitled to the right of appeal upon that question.

After a careful consideration of the very able and elaborate briefs prepared by both sides in this case, this court finds that the ruling and the judgment of the lower court on the appeal of the appellant should be and it is hereby reversed and this cause is remanded to the lower court with directions to enter judgment in accordance with this opinion.

On the appeal of the intervenors the judgment and decree of the lower court is correct and it is affirmed.

The cause is reversed and remanded in part; affirmed in part.

KINDIG, C. J., and STEVENS, ANDERSON, KINTZINGER, and DONEGAN, JJ., concur.

EVANS and ALBERT, JJ., took no part.