C.F. SALES, INC., A Delaware
Corporation, Appellee,

v.

AMFERT, INC., A Foreign Corporation,
Royster Company, A Foreign Corpora-
tion, and Olin Corporation, A Foreign
Corporation, Appellees,

and

Pan American Commodities, Division of
Pan American Trade Development, A
Foreign Corporation, Appellant.

OLIN CORPORATION, A Foreign
Corporation, Appellee,

v.

T.H.E. INVESTMENT CORPORATION,
A Corporation, Appellant.

No. 68601.

Supreme Court of Iowa.

Dec. 21, 1983.

Michael Noyes of Rehling, Lindburg & Gosma, Davenport, for appellant Pan Am.

A. John Frey, Jr., of Jurgemeyer, Frey & Haufe, Clinton, for appellant T.H.E.

William C. Davidson of Lane & Waterman, Davenport, for appellee C.F. Sales.

James D. Bruhn of Shaff, Farwell & Senneff, Clinton, for appellee Amfert.

Peter C. Fieweger and Dale G. Haake of Katz, McAndrews, Durkee, Balch & Lefstein, P.C., Rock Island, Ill., for appellee Olin.

Considered by UHLENHOPP, P.J., and HARRIS, McGIVERIN, LARSON, and CARTER, JJ.

UHLENHOPP, Justice.

This appeal involves three main legal questions: (1) whether substantial evidence was introduced of a principal-agent relationship between a securities holding company and an agricultural commodities broker; (2) whether the trial court erred in holding that a manufacturer did not tortiously interfere with contracts among subsequent purchasers of its product; and (3) whether the product was "received" by subsequent purchasers.

I. *Facts.* The first chapter of the case deals with International Materials Corporation (IMC) and T.H.E. Investment Corporation (T.H.E.).

A. IMC bought and sold agricultural commodities for a number of years. It lacked sufficient capital to do business on a large scale. Beginning in 1974 it established a credit accommodation arrangement with T.H.E., a securities holding company. T.H.E. had a Dun & Bradstreet credit rating sufficient to support large transactions on credit. When a supplier of agricultural commodities refused to accept IMC's own credit, IMC would offer T.H.E.'s credit, which T.H.E. permitted subject to certain restrictions: (1) IMC could not surpass a certain dollar limit of outstanding credit ($3.5 million at times pertinent to this lawsuit); (2) the transaction had to be a "closed loop" (when IMC purchased a product, it already had a buyer); and (3) IMC was to obtain permission to use T.H.E.'s credit on a transaction-by-transaction basis. IMC paid T.H.E. a fee for use of its credit (in 1976, 1977, and 1978 IMC paid $9336.00, $44,267.00, and $70,135.00, respectively). For reasons which do not appear of record, T.H.E. itself desired to be the owner of the commodity during the transactions.

In December 1977, T.H.E. formalized the arrangement in the following letter to IMC:

We have been operating for some time in purchasing chemicals, raw materials

and other types of products for resale to other parties.

This letter will confirm our agreement that in any such case, that you are acting as our agent and bailee and that the chemicals, raw materials and other types of products are purchased and will be purchased in our name and on our behalf by you as our agent, and that we shall be the sole owners thereof.

We hereby authorize and direct you to invoice the ultimate purchaser for the selling price of the chemicals, raw materials and other types of products that are sold by you on our behalf and to collect the proceeds arising from such invoices as our agent. Once collected you will make payment of the funds to our suppliers in our name and on our behalf.

The letter was signed by Ernest Friedlander, a vice-president and director of T.H.E., and Marc S. Newkirk, president of IMC.

In practice, IMC generally requested and received credit approval from Friedlander, who doubled as treasurer and a director of IMC. Carroll Baum, treasurer of T.H.E., also sometimes authorized the use of T.H.E.'s credit. When approval was given, T.H.E. contacted the supplier and stated that it would accept billing. At the request of IMC, T.H.E. also sent its financial statements to suppliers so they could better assess its financial capability. At trial, Friedlander and Baum testified that the initial restrictions upon IMC and the course of doing business were never modified.

T.H.E., however, did not have an accounting system of its own to monitor IMC's activities. Instead, it relied upon IMC to determine the dollar amount of the fees owed and to provide monthly reports that included the amount of outstanding credit. These reports were typically months in arrears. As a result, T.H.E. had no simple way of determining how many transactions IMC was entering on T.H.E.'s credit and had difficulty knowing at any given time whether IMC was complying with established credit limits.

By the beginning of 1979, IMC was using T.H.E.'s credit without the required trans-action-by-transaction request on more than one half of its T.H.E.-backed purchases. Newkirk believed he and Friedlander had an "understanding" permitting this procedure, though Friedlander claims he first knew of such conduct when this lawsuit was commenced. Newkirk testified Friedlander had to be aware of this practice because of the volume of business being conducted and the fees generated and paid (though the evidence showed IMC paid no fees in 1979).

Also early in 1979, IMC exceeded its credit limit. At one point in April the amount reached $5.4 million. Newkirk attributed this to seasonal aberrations and continued to use T.H.E. credit. When Friedlander became aware of the excess he warned Newkirk to reduce the outstanding credit to within $3.5 million. Early in August, Baum became aware that IMC still was not within the credit limit and sent Newkirk a letter informing him that the IMC–T.H.E. relationship could not continue if the outstanding credit was not reduced and if fee payments and credit reports, then months overdue, were not brought up to date. Friedlander and Baum testified that at this point they decided to stop approving IMC's credit requests, and Baum closed a "lock box" bank account that was used in the arrangement. Neither, however, informed IMC that the relationship had ceased, nor did they attempt to inform those who dealt with IMC, which continued to operate.

B. Olin Corporation (Olin) makes products for agriculture. Late in July 1979, Olin manufactured a quantity of urea fertilizer near Lake Charles, Louisiana. Early in August, it loaded 1533.76 tons of the fertilizer into a Midwest Towing Company barge for shipment up the Mississippi River to Savage, Minnesota, to be stored for the winter. While the barge was en route, Olin salesmen Sam Stiles and Joe Carl Montgomery took steps to sell the fertilizer by contacting potential buyers. On the morning of Friday, August 24, 1979, Montgomery received a telephone call from Skip

Coppolla, who at that time was an employee of IMC. Montgomery testified:

Q. [W]ould you state, please ... what Mr. Coppolla stated to you when he called you that morning? A. He called me and ... said, "I understand that Olin has a barge of urea on the Mississippi that you want to sell," and I said, "Yes. We are considering selling it." He said, "Well, I'd like to buy it." He asked me what I wanted for it; and I computed him a price; and he said, "I believe I can handle it for that price; but let me check, and I will call you back."

Q. Did you know Mr. Coppolla prior to that phone call? A. I don't believe I had met him. I can't say that for certain. I attended a trade meeting in July of that year in New Orleans; and I may or may not have met him; but I had talked to him on the phone on numerous occasions.

Q. Did he identify the business firm that he was with or did you know? A. I knew that he was with International Materials.

Q. All right. Was that the extent of that conversation, then, by telephone? A. Yes.

Q. What was the next thing that occurred on that date with reference to your activity and this barge of urea? A. Skip Coppolla called me back probably about thirty minutes to an hour later and said that they would like to buy the barge of urea.

Q. Who is they? A. Well, International Materials.

Q. And, then, what was said? A. Okay. I said, "Skip, we agreed on price; however, I cannot sell to you on a credit basis. I do not have any credit set up on International Materials. The only way that I can do business with you is on transfer of funds, cash." And he said, well, he wasn't prepared to do that.

Q. What do you mean by transfer of funds, cash? A. Transfer of funds from one bank to the other, and I told him who our bank was and started to give him the account number; and he said, "Hold it. We are not prepared to do that." And I said, "Well, that's the only way that I can do business." And he said, "Well, let me do this, then. Let me bill it to my parent corporation, T.H.E. Investment, and let them purchase it." And I said, "Well, Skip, I don't have the authority to do that. You will have to call Mr. Huff, our credit manager; and he can rule on that."

Q. Who is Mr. Huff? What's his first name? A. John Huff. He was—at that time, he was credit manager of the agriculture credits department.

Q. Up to that point, had the agriculture division or department in Little Rock made any sales on credit to International Materials Corporation? A. No.

Q. Had it had any business dealings with International Materials Corporation? A. No.

Q. Was [sic] was the extent, then, of the conversation? A. I connected him with Mr. Huff's office.

Q. Did you know at that time whether there was any relationship between International Materials Corporation and T.H.E. Investment Corporation? A. Mr. Coppolla or somebody from that firm told me that International Materials was a subsidiary of T.H.E. Investment.

Q. What was your next connection, then, with this sale, transaction, regarding the urea from barge MWT7236? A. I went to lunch and came back and asked Mr. Huff if he had talked to Skip Coppolla and people from T.H.E., and he said he had.

John A. Huff testified:

Q. Now, you've been testifying about receiving a telephone call with respect to the sale of approximately 1500 tons of urea on August 24, 1979; is that correct? A. Yes.

Q. Do you recall at this time what was your first contact or your first involvement with that particular sale? A. My first contact, I believe would have been Montgomery contacted me and wanted to know ... if he ... got an order from I.M.C., would I approve it;

**548**

and I looked in the Dun & Bradstreet book; and I told him that I would not extend the credit.

...

Q. ... I gather that a telephone call was, in fact, made to you subsequent to that conversation that you had with Mr. Montgomery? A. [Y]es, I had a call.

...

Q. And do you recall what was the first thing that was said on the telephone during that conversation?

...

A. Yes. ... [H]e identified himself and says ... that our marketing departments didn't understand the transaction at all; that T.H.E. Investment was going to purchase the material.

Q. I gather that today you do not recall the identity of that person who— when he identified himself? A. No, sir.

...

Q. Did you believe that he was from T.H.E.? A. Yes.

...

Q. What words did he use to expressly indicate that he was from T.H.E.? A. It was my understanding that he said he was credit manager.

...

Q. He told you expressly that he was credit manager from T.H.E.? A. That's what I remember, yes.

...

Q. At what point did you approve the sale to T.H.E.? ... A. While we were on the telephone, as I remember.

Q. This is the one telephone conversation with this individual who represented that he was the credit manager of T.H.E.? A. I believe that's right, yes, sir.

Q. And how long did that telephone conversation last? A. Oh, five, maybe ten minutes, something like that.

...

A. ... I approved the credit based upon the financial D & B rating and the numbers he gave me....

Subsequent to the telephone conversation Huff received a copy of T.H.E.'s financial statement by special delivery mail. It arrived in a T.H.E. envelope and without a covering letter. The postage mark was by T.H.E.'s postage machine, though T.H.E. generally did not send such material special delivery.

A business card of Donald Hichens, an IMC vice-president, was attached to the financial statement. The evidence shows it was attached by Carroll Baum's secretary, who also mailed the report. She did so without specific authorization, although Baum said his office regularly complied with requests by IMC to send such statements.

Huff testified that the report did not confirm T.H.E.'s role in the sale but that it did confirm the previous financial information he had obtained. He made no effort to determine whether the caller had authority to purchase on behalf of T.H.E.

Huff sold the urea for $140 per ton in the telephone conversation from which we have quoted, on thirty-days' credit. Olin diverted the urea to Clinton, Iowa, for storage in IMC's space.

Later T.H.E. did not respond to Olin's demands for payment. Nor, when the present action was initiated, did T.H.E. assert an ownership interest in the fertilizer.

C. In 1978, C.F. Sales, a company engaged in the business of public warehousing and the unloading of bulk materials at Clinton, Iowa, entered into an agreement with IMC for the lease of storage space in its warehouse on the Clinton municipal dock. The lease was in effect on August 24 and 25, 1979. On August 24 or 25, Thomas E. Burken, terminal manager at Clinton for C.F. Industries (parent company of C.F. Sales), received a telephone call from Jim McCain of IMC informing him that a barge load of urea was en route and was to be unloaded and stored in IMC's leased space. McCain gave Burken the

barge number, date of arrival, the approximate tonnage of urea, and instructions to have marine surveyors determine the exact tonnage. McCain also provided Burken with "release numbers".

"Release numbers" are used in the agricultural commodity business to facilitate the transfer of goods. When a warehouseman is presented such numbers by a purported purchaser of a product, the warehouseman is authorized to release the product if the numbers correspond to those in his possession.

No title documents, such as bills of lading, were presented by IMC to C.F. Sales. This was not unusual; those documents are normally weeks behind the goods, which may be bought and sold several times before such documents are even prepared.

The barge arrived at Clinton on August 29, 1979, and the urea was unloaded and placed in IMC's storage space.

D. On September 7, 1979, IMC sold the urea to Amfert, Incorporated (Amfert), also an agricultural commodities broker, for $143 per ton. That price was offset against an amount IMC owed Amfert for a transaction in July 1979. Amfert, in turn, sold the urea on October 1, 1979, to another commodities broker, Pan American Commodities (Pan Am), for $145 per ton. Pan Am paid Amfert. Pan Am then contracted to sell the urea to Royster Company (Royster) for $148 per ton. Throughout this series of transactions the urea itself remained in the space leased by IMC in the C.F. Sales warehouse; the release numbers, however, passed from purchaser to purchaser.

For a period of time extending back to April 1979, IMC had failed to pay C.F. Sales for the space it had leased. The outstanding storage charge exceeded $20,000. Because of this, C.F. Sales refused to release the urea to Royster, as it was preparing to secure payment of the delinquent storage by attaching the urea. On October 10, 1979, however, C.F. Sales discovered that IMC had taken bankruptcy on October 3, 1979. C.F. Sales therefore released the urea to Royster, which had produced the proper release numbers. On October 22, five trucks were loaded with 107.935 tons of urea and delivered in accordance with Royster's instructions. Royster paid Pan Am $14,500 for that quantity. Part of the remainder of the urea was loaded on railroad cars for delivery.

At this point, Olin discovered that IMC was in bankruptcy. Olin demanded that C.F. Sales retain all the urea that remained, including the part on the railroad cars, and threatened suit if C.F. Sales did not do so. C.F. Sales stopped loading procedures and returned the undelivered urea to the warehouse.

E. On October 25, 1979, C.F. Sales filed the present interpleader action against all parties involved except IMC. Royster is a nominal party only. At C.F. Sales' request, the district court ordered C.F. Sales to preserve and maintain the urea, which it did until September 24, 1980, when, by agreement of the parties, it sold the urea for $205,675.60 and deposited the money with the clerk of the district court.

Subsequently, C.F. Sales and the interpleaded defendants interposed claims, cross claims, and counterclaims. C.F. Sales sought to recover from Olin storage fees and costs sustained from October 23, 1979, until September 24, 1980, and for attorneys' fees attributable to the interpleader. C.F. Sales initially tried to recover storage fees and costs incurred by IMC from April 1979 to October 23, 1979, but it later dismissed that claim.

Pan Am interposed a cross claim against Amfert for breach of an implied warranty of title, seeking to recover the price of the urea and lost profits. Pan Am also sought its attorneys' fees from Amfert that were not directly attributable to the litigation between Pan Am and Amfert.

Pan Am and Amfert filed cross claims against Olin, asserting tortious interference with a contractual relationship—Pan Am claiming Olin disrupted its contract with Royster, and Amfert claiming Olin interfered with its contract with Pan Am. Amfert also sought indemnity from Olin

for any amount it might owe Pan Am, and it asked for its attorneys' fees not arising directly from the Amfert-Olin litigation.

Olin initiated a third-party claim against T.H.E. for the price of the urea and for indemnity for the storage charges and fees after October 23, 1979.

The parties tried the controversy to the court. The court initially held the interpleader action to be proper. It also held that C.F. Sales was entitled to its storage costs from Olin from October 23, 1979, until September 24, 1980, in the amount of $22,084.63.

The court concluded in addition that Olin dealt with T.H.E. as the purchaser of the urea and had a cause of action against T.H.E. for breach of contract, but that Olin's right to stop delivery of the urea terminated on August 29, 1979, when the urea was received in IMC's leased space at C.F. Sales' warehouse. The court concluded that IMC thus obtained voidable title and Amfert and Pan Am subsequently became good faith purchasers for value. Title finally rested, then, in Pan Am. The court therefore entered judgment for Pan Am and against Amfert for $210,337.36. The interpleader fund satisfied $205,675.40 of that judgment and Amfert was charged with the difference of $4661.76 plus interest.

Regarding claims that Olin tortiously interfered with the existing contracts of Amfert and Pan Am, the court found for Olin even though Olin without right purposely stopped delivery to Royster knowing the urea had been sold. Also in Olin's favor, the court ruled that an agency relationship existed between IMC and T.H.E. and that Olin was entitled to judgment against T.H.E. for $214,726.40 as the price of the urea. The court also required T.H.E. to indemnify Olin for C.F. Sales' storage charges (Olin had been held liable for those charges as the loser in the interpleader action).

All claims for attorneys' fees were denied, and all court costs were taxed to T.H.E.

■ II. *Interpleader, scope of review.* Interpleader originated in equity as a means by which a disinterested stakeholder of money or property could avoid vexatious litigation with multiple claimants by making them defendants and requiring them to establish their claims among each other to the fund or res. 45 Am.Jur.2d *Interpleader* § 2 (1969); 48 C.J.S. *Interpleader* § 4 (1981). In such a proceeding the first proposition to be established is the entitlement of the plaintiff-stakeholder to maintain interpleader; if the plaintiff establishes that proposition, the trial and adjudication of the defendants' claims follows. 45 Am. Jur.2d, *supra,* §§ 35, 38; 48 C.J.S., *supra,* §§ 47, 48.

From an early day equitable interpleader has been part of Iowa jurisprudence, although Iowa also had a very limited form of statutory interpleader. *Stephenson v. Stephenson,* 64 Iowa 534, 21 N.W. 19 (1884); *Lindsey v. Western Mutual Aid Society,* 84 Iowa 734, 50 N.W. 29 (1891); *Hoyt v. Gouge,* 125 Iowa 603, 101 N.W. 464 (1904); *Kelly, Shuttleworth & McManus v. Central National Bank & Trust Co.,* 217 Iowa 725, 248 N.W. 9, *supplemental opinion,* 250 N.W. 171 (1934); *Equitable Life Insurance Co. v. Johnston,* 222 Iowa 687, 269 N.W. 767 (1936); Iowa Code §§ 1685, 1686 (1851); Iowa Code §§ 11002–11005 (1939). See Comment, 21 Iowa L.Rev. 644 (1936).

In the federal rules of civil procedure, the United States Supreme Court adopted a broad form of interpleader as rule 22. When this court adopted civil rules, it followed the substance of that federal rule with some changes in structure. Iowa R.Civ.P. 35–41; 1 *Iowa Rules of Civil Procedure Annotated,* Comment to Rule 35 (West 1970). These Iowa rules supplanted the prior statutes, 1943 Iowa Acts ch. 278 app. I at 364, and govern Iowa interpleader at the present time. *Stolar v. Turner,* 238 Iowa 1168, 29 N.W.2d 417 (1947); *Spahn & Rose Lumber Co. v. Iowa Steel & Construction Co.,* 257 Iowa 168, 131 N.W.2d 791 (1964); *Iowa State Commerce Com-*

*mission v. IGF Insurance Co.*, 309 N.W.2d 445 (Iowa 1981).

Rule 35 is the principal one:

A person who is or may be exposed to multiple liability or vexatious litigation because of several claims against him for the same thing, may bring an equitable action of interpleader against all such claimants. Their claims or titles need not have a common origin, nor be identical, and may be adverse to, or independent of each other. Such person may dispute his liability, wholly or in part.

In the present case the first question before the trial court was C.F. Sales' right to maintain interpleader, a question to be heard and decided by equitable proceedings since the action is equitable in nature under rule 35. Some of the defendants contested this issue, but the trial court upheld interpleader and in this court none of the parties challenge that holding. We therefore take the interpleader as a proper proceeding.

■ The trial court then took up the various claims, cross claims, and counterclaims of the parties. These disputes would respectively be properly tried by equitable or ordinary proceedings according to their nature. *Jefferson Standard Insurance Co. v. Craven*, 365 F.Supp. 861 (D.C.Pa.1973); 48 C.J.S. *Interpleader* § 48 (1981). As to disputes to be tried by ordinary proceedings, parties would be entitled to jury trial of issues upon proper jury demand. Iowa R.Civ.P. 177*(b)* and *(c)*. Actually the parties tried these disputes to the court in one trial by ordinary proceedings; the court ruled on objections to evidence. *See Citizens Savings Bank v. Sac City State Bank*, 315 N.W.2d 20, 24 (Iowa 1982) (court's ruling on objections is litmus test for determining whether trial was by equitable or ordinary proceedings).

■ As trial of the parties' claims was by ordinary proceedings, we review on errors of law and not de novo. *Id.; Western Bank v. Morrill*, 245 Or. 47, 420 P.2d 119 (1966). This is not a momentous point in the present case, however, as the issues

presented to us involve questions of law. We thus proceed to the specific issues raised in the appeal.

III. *C.F. Sales' claims against Olin.* We first take up C.F. Sales' claims against Olin. These claims are incidental to C.F. Sales' role as stakeholder.

A. When Olin asserted its claim to the urea on October 23, 1979, C.F. Sales was loading the fertilizer into railroad cars for shipment by Pan Am to Royster. Because of Olin's claim, which conflicted with the ownership claims of Amfert, Pan Am, and Royster, C.F. Sales stopped loading the cars, returned the undelivered urea to the warehouse, initiated this interpleader action, and asked the district court for an order to store and preserve the urea. The urea remained in C.F. Sales' warehouse until it was sold by agreement of the parties on September 24, 1980. As part of the interpleader, C.F. Sales sought to recover its storage costs and expenses subsequent to October 23 from the losing interpleaded party. C.F. Sales did not itself claim ownership of the urea, but it had the urea on its hands. It dismissed its claim for prior storage.

■ The general rule is that such a stakeholder is entitled to its costs. Such costs "may be allowed ... against some of the claimants or parties made defendants to the bill." 48 C.J.S. *Interpleader* § 54 (1981). *See also* 45 Am.Jur.2d *Interpleader* § 41 (1969). Our rules state: "Costs may be taxed against the unsuccessful claimant in favor of ... the party initiating the interpleader." Iowa R.Civ.P. 40.

■ We do not think that the term costs should be given a narrow interpretation of court costs only. The burden to a stakeholder in possession of a commodity may be greater from maintenance of the commodity—for the benefit of the defendants—than from court costs. The question, therefore, relates to who should reimburse C.F. Sales for its expense. The trial court placed the burden on Olin.

■ In assessing the storage costs to Olin the trial court correctly found that

Olin wrongfully reclaimed the urea on October 23. This was nearly two months after the purchaser, IMC (or T.H.E.), had received the urea on August 29, 1979, at the warehouse space leased by IMC from C.F. Sales. At that time Olin lost all right to reclaim the urea. Iowa Code § 554.-2705(2)(a) (1979) ("As against such [insolvent] buyer the seller may stop delivery until receipt of the goods by the buyer."); *McFetridge, Burchard & Co. v. Piper*, 40 Iowa 627, 628 (1875) ("If, after their arrival, [goods] are stored in a warehouse by the carrier as agent of the consignee, the vendor's right of stoppage is by that fact terminated."). *See also Interlake, Inc. v. Kansas Power & Light, Co.*, 79 Ill.App.3d 679, 684, 34 Ill.Dec. 954, 958, 398 N.E.2d 945, 949 (1979) (seller's stop delivery right can be exercised until "receipt of the goods" by the buyer, including "receipt by the buyer's designated representative, the subpurchaser, when shipment is made direct to him and the buyer himself never receives the goods").

Under the facts of this case, Olin's right to stop delivery also terminated when C.F. Sales by its acts acknowledged to Amfert, Pan Am, and Royster that it was holding the urea for them. C.F. Sales acknowledged the sale to the subsequent purchasers by accepting the release numbers that were presented, by shipping 108 tons of goods to Royster, and by beginning to load the remainder of the urea into cars for shipment. Iowa Code § 554.2705(2)(b) ("As against such [insolvent] buyer the seller may stop delivery until acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer."). *See also Interlake*, 79 Ill. App.3d at 684, 34 Ill.Dec. at 959, 398 N.E.2d at 950 (adhering to the instructions of the subpurchaser and holding the goods for more than two months pursuant to those instructions was further evidence of acknowledgement by the bailee that it held the goods for the subpurchasers). *See generally* 3 *Williston on Sales* § 24–6 (1974) ("stoppage *in transitu* exists in the seller until that time that the goods have been personally delivered to the buyer or to

some designated person whose obligation to the buyer is the single duty of taking, carrying, and delivering the goods to the buyer."). The trial court was thus correct in assessing storage charges against Olin from October 23, 1979, until the urea was sold.

■ B. C.F. Sales claims, however, that the trial court erred in refusing to award it attorneys' fees stemming solely from its role as stakeholder. We have not previously decided this issue, although a federal district court in Iowa has predicted we would probably follow the majority rule and allow such recovery. *Community School District of Eldora v. Employers Mutual Casualty Co.*, 194 F.Supp. 733, 741 (N.D.Iowa 1961). The subject is not covered by statute in this state. The majority rule is as follows:

[A] party who is faced with conflicting claims to funds or property in his possession, or has reasonable doubt as to the party entitled thereto, who stands indifferent between the claimants and claims no interest in the funds or property, and who in good faith interpleads the various claimants, is entitled to an allowance for attorney fees.

*Annot.*, 48 A.L.R.2d 190, 193 (1956). *See also* 45 Am.Jur.2d *Interpleader* § 42 (1969); 48 C.J.S. *Interpleader* § 55 (1981). The reason for such an exception to the general rule on attorneys' fees is that a disinterested stakeholder should not be burdened with the expense of an interpleader that has benefited others; the expense is more reasonably placed on the unsuccessful claimant to the interpleaded fund or property.

The question, then, is whether C.F. Sales stood indifferent to the claimants. At one time C.F. Sales sought to attach the urea to recover past-due storage fees, and it also originally included a claim in the interpleader action for those charges. But it abandoned the attempt to attach the urea prior to Olin's ownership claim on October 23, and it later dismissed the claim for storage fees in the interpleader action. Thereafter

it sought only to recover storage charges subsequent to initiating the interpleader. We do not regard that claim as making C.F. Sales "interested".

We hold that C.F. Sales is entitled to judgment against Olin for its attorneys' fees and expenses attributable to the interpleader, and overturn that part of the trial court's judgment.

IV. *Olin's claims against T.H.E.* We next approach the Olin-T.H.E. dispute.

A. T.H.E. argues the trial court erred in holding that Olin should recover the price of the urea from T.H.E. because the record does not contain substantial evidence that IMC acted as T.H.E.'s agent.

■■■ Whether a principal-agent relationship exists is ordinarily a question of fact to be decided by the trial court in the absence of a jury. *Reed v. Bunger*, 255 Iowa 322, 329, 122 N.W.2d 290, 295 (1963). Fact findings of a trial court in cases tried by ordinary proceedings have the effect of a special verdict, and if supported by substantial evidence they bind us. *Sand Seed Service, Inc. v. Bainbridge*, 246 N.W.2d 911, 912 (Iowa 1976). "Substantial" evidence means evidence that "a reasonable mind would accept as adequate to reach a conclusion." *Briggs v. Hinton Community School District*, 282 N.W.2d 740, 743 (Iowa 1979).

■■■ The trial court highlighted the evidence it relied on in the following manner:

The Court FINDS and CONCLUDES that T.H.E. has no defense to Olin's action against them on the contract [sic] that the agency relationship did not exist. The Court FINDS that Olin did not act negligently with IMC–T.H.E., nor was the actual and apparent agency agreement ever effectively terminated by T.H.E. During August of 1979, T.H.E. became aware of IMC's financial plight and T.H.E.'s potential liability. Officers of T.H.E. testified that IMC's agency was limited and special and that IMC had exceeded that limit when they entered into this contract with Olin and that this transaction had not been specifically au-

thorized. The Court FINDS this testimony to be not credible. The Court FINDS ample evidence that the agency agreement continued; that T.H.E. was paid a fee by IMC for these credit accommodation practices; that T.H.E.'s officers and directors knew or should have known of IMC's financial circumstances and the extent of their agency agreement, lack of specific special agency authorization, and their acknowledged liability of five million dollars on about August 8, 1979, far exceeding any limits testified to; yet, the practice continued when the fertilizer was bought on August 24, 1979, from Olin.

. . .

The Court FINDS and CONCLUDES, therefore, that T.H.E. was the purchaser of the fertilizer from Olin; and that IMC acted only as T.H.E.'s agent; that T.H.E. has failed to pay the contract price of $214,726.40; has breached the contract; and therefore, judgment should be entered for Olin and against T.H.E. for said sum plus interest and costs as allowed by law.

The trial court relied on substantial evidence in finding that IMC had actual or apparent authority to act on T.H.E.'s behalf. Its decision is binding.

B. The trial court also ruled that Olin was entitled to be indemnified by T.H.E. for the storage fees and other expenses incurred by C.F. Sales as a result of the interpleader.

■■■ This court recognizes the common-law doctrine of indemnity, absent a contract, in four situations:

(1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged.

(2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of, and in reliance upon the one sought to be charged. Restatement Restitution, Sec. 90.

(3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.

(4) Where the one seeking indemnity has incurred liability merely because of failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged.

*Peters v. Lyons,* 168 N.W.2d 759, 767 (Iowa 1969).

This court has held that no common-law right exists to recover expenses and attorneys' fees if the party initially charged is defending its own act of primary negligence. *Rauch v. Senecal,* 253 Iowa 487, 491, 112 N.W.2d 886, 888 (1962). *See Iowa Power & Light Co. v. Abild Construction Co.,* 259 Iowa 314, 338, 144 N.W.2d 303, 317 (1962) ("[A] party guilty of independent acts of negligence cannot receive indemnity from one also actively negligent.").

■ This interpleader occurred because Olin wrongfully reclaimed the urea, preventing ultimate actual transfer of the urea to Royster and directly causing the storage fees and expenses for which Olin seeks indemnity. Applying the facts to the four-part common-law indemnity doctrine, Olin cannot rely on any of the four situations: it is not derivatively or vicariously liable; it has not incurred liability "at the direction, in the interest of, [or in] reliance upon" T.H.E.; T.H.E. has breached no duty owed Olin in regard to the interpleader (although it breached a contractual duty to purchase the urea, which is distinct from the interpleader); and Olin has not incurred liability for interpleader expenses as the direct result of misconduct by T.H.E., but rather as the result of its own unlawful reclaiming of the urea. We therefore overturn the judgment of the trial court on this issue and hold that Olin has no right to indemnification by T.H.E.

■ V. *Pan Am's claims against Amfert.* Amfert contends that the trial court erred in awarding Pan Am damages for lost profits in Pan Am's sale to Royster; the trial court held that Amfert breached its warranty of title to the urea.

Amfert argues that a buyer of goods cannot recover from a seller where the sole basis for the claim of breach of warranty of title is that a third party *wrongfully asserted* title in the goods.

Section 554.2312 of the Iowa Code provides in pertinent part:

1.  Subject to subsection 2 [exclusion of warranty] there is in a contract for sale a warranty by the seller that

    *a.* the title conveyed shall be good, and its transfer rightful; and

    *b.* the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

The record shows that in this industry, sales are made rapidly and informally by telephone and deliveries are accomplished by passing the release numbers to the buyers as the goods pass from broker to broker. Olin sold the urea to IMC (or T.H.E.) and delivered the urea to IMC's leased warehouse space; title then passed.

The urea thus was beyond Olin's control. IMC sold and, by giving the release numbers, delivered the urea to Amfert, and title passed to Amfert. Then Amfert sold and similarly delivered the urea to Pan Am, and title passed to Pan Am. No one except Olin and Pan Am (and Pan Am's purchaser, Royster) claimed title to the urea.

■ Pan Am received title from Amfert, and Olin's claim to the title is unfounded. As no security interest, lien, or encumbrance existed against the urea, no breach of a warranty of title by Amfert to Pan Am occurred. A breach of warranty of title occurs when an outstanding superior title *exists.* 67 Am.Jur.2d *Sales* §§ 480, 487 (1973); 77 C.J.S. *Sales* § 335a (1952).

The trial court erred in awarding Pan Am damages for breach of implied warranty of title, and we overturn that judgment. No occasion exists to determine whether Pan Am would be entitled to attorneys' fees from Amfert if it had prevailed on its warranty claim.

VI. *Pan Am's claims against Olin.* Because Pan Am was unable to perform its contract fully with Royster, it made claim against Olin for tortious interference with that contract. The trial court found that Olin knowingly interfered with the Pan Am-Royster contract but denied recovery for tortious interference.

■ We listed the elements necessary to establish a prima facie case of tortious interference with an existing contractual relation in *Stoller Fisheries, Inc. v. American Title Insurance Co.*, 258 N.W.2d 336, 340 (Iowa 1977):

1. The existence of a valid contractual relation;

2. Knowledge of the relationship;

3. Intentional interference inducing or causing a breach or termination of the relationship; and

4. Resultant damage to the party whose relation has been disrupted.

A purpose to injure or destroy an existing contract is not essential. *Farmers Cooperative Elevator, Inc. v. State Bank*, 236 N.W.2d 674, 679 (Iowa 1975).

■ Under the trial court's fact findings, the conduct of Olin falls within the parameters of these four elements. First, Pan Am and Royster had a valid contractual relationship for the sale of urea. Second, Olin had knowledge of that relationship; if Olin did not know of the relationship prior to stopping delivery, it knew on October 23, 1979, when it discovered that C.F. Sales was loading the urea into cars for shipment to Royster. Third, Olin's action was intentional; it was done by design. *Lerch v. Lerch*, 177 So.2d 159, 162 (La.App.1965). The natural and reasonable consequence of inducing C.F. Sales to stop delivery, by the nature of the act and the manner in which it was done, resulted in harm to the Pan Am-Royster contract, and that harm was intentional. *Velotta v. Western Fire Insurance Co.*, 121 So.2d 857, 858 (La.App.1960). It was not an act that can be traced to impaired judgment. *Rosa v. Liberty Mutual Life Insurance Co.*, 243 F.Supp. 407, 408 (D.C.Conn.1965).

Finally, Pan Am incurred lost profits when the contract was disrupted.

The trial court relied on the following rule in Restatement (Second) of Torts § 773 (1977):

One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

Comment *a* to that section states this defense

is of narrow scope and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means. Under these circumstances his interference is not improper although he knows that his conduct will cause another to break his contract.... If any of these elements is lacking, the rule stated in this Section, does not apply....

For Olin to interfere with the Pan Am-Royster contract and also to take refuge in this defense, Olin must have had a "legally protected interest". The trial court found and we agree that

Olin's right to stop delivery of the fertilizer terminated August 29–30, 1979, when it delivered to C.F.'s warehouse; and all of Olin's attempts to regain title and exercise its rights subsequent to that date were lost by virtue of the delivery and the subsequent purchases by Amfert and Pan Am as good faith purchasers for value without knowledge of potential defects in the title.

Olin did not have a legally protected interest in the urea, and the trial court's reliance on section 773 was misplaced. Pan Am is entitled to damages from Olin for its lost profits on the Royster sale, together with interest.

VII. *Amfert's claims against Olin.* Amfert argues it is entitled to recover from Olin on its claim of tortious interference with its contract with Pan Am. But Amfert sold and delivered the urea to Pan Am, under the mode of delivery of this commodity which exists among brokers. Olin did not interfere with that contract and is not liable to Amfert on that account.

VIII. *Dispositions.* The portions of the trial court's judgment not held erroneous in this opinion, except as to court costs, remain unchanged.

We direct that upon remand the trial court hear the parties' arguments, upon the record made at the trial originally, on (1) the amount of C.F. Sales' attorneys' fees and expenses as stakeholder for which C.F. Sales is to have judgment against Olin, and (2) the amount of Pan Am's additional damages for which it is to have judgment against Olin based on tortious interference with contract; and that the trial court then render findings, conclusions, and supplemental judgment in accord with the preponderance of the evidence and this opinion. *See Busker v. Sokolowski,* 203 N.W.2d 301, 304 (Iowa 1972).

We assess the court costs in this appeal one-half to Olin and one-half to T.H.E. We direct the trial court on remand to assess similarly all court costs in district court. Iowa Code §§ 625.3, .4 (1983); Iowa R.Civ.P. 40.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.