INTERLAKE, INC., Plaintiff-Appellee, *v.* THE KANSAS POWER AND LIGHT COMPANY *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 78-590

Opinion filed December 19, 1979.

Winston & Strawn, of Chicago (Ellen C. Newcomer and David M. Webster, of counsel), for appellants.

Wildman, Harrold, Allen & Dixon, of Chicago (Thomas D. Allen and Kay L. Schichtel, of counsel), for appellee.

Mr. JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Interlake, Inc., brought this declaratory judgment action against defendants Kansas Power and Light Company ("KPL") and Amsted Industries, Inc. Interlake sold structural pipe to Continental Tube & Pipe Corporation who, in turn, sold it to KPL. KPL requested Continental to ship the pipe to Plexco for rust-proofing; Plexco is a subsidiary of Amsted. While awaiting instructions from KPL, Plexco was given a stop delivery order by Interlake after Continental failed to make payment to Interlake. Interlake sought a judgment declaring that it properly ordered Plexco to stop delivery of the pipe and that it was entitled to repossess and resell the pipe. KPL counterclaimed, seeking a declaratory judgment that it was lawfully entitled to the pipe and damages for the alleged unlawful stop order. In a bench trial, the court entered judgment in favor of Interlake on the complaint and against KPL on the counterclaim. We reverse and remand.

In April 1976, KPL placed a quotation inquiry for certain quantities of structural pipe with Continental, a pipe broker in St. Louis, Missouri. After finding a source for this pipe, Continental contacted KPL to report this information; it stated further that the price quoted included the cost of shipment to Meade, Kansas, the ultimate destination of the pipe. On April 22, 1976, KPL verbally requested Continental to order the pipe and

ship it to "KPL care of Plexco," a pipe coater in Franklin Park, Illinois. That same day, Continental ordered the specific pipe quantities from Interlake.

Interlake's credit manager investigated Continental and found it had financial weaknesses. Determining that the normal credit terms were not acceptable because of Continental's financial status, Interlake sought and obtained more stringent credit terms. Interlake limited Continental's credit line to approximately $50,000; it required prepayments of $150,000 on the first shipment of approximately $198,000, $75,000 on the second shipment of approximately $129,000 and $70,000 on the third shipment of approximately $115,000.

KPL contacted Plexco to rustproof the pipes ordered from Continental. On May 19, 1976, KPL issued its written purchase order to Continental, designating Plexco as a stop point. Two days later, KPL confirmed its arrangements with Plexco by sending it a written purchase order. Between June 1 and July 20, 1976, Interlake shipped the entire order to "KPL c/o Plexco" in Franklin Park. That designation appeared on Interlake's mill order, bills of lading, and invoices to Continental.

Pursuant to KPL's instructions, Plexco unloaded the pipe and stored it until July 13, 1976. On that date, KPL instructed Plexco to coat and ship the pipe. Plexco then sought and received KPL's consent to coat the incoming pipe rather than that in storage. KPL later modified its instruction; on July 22, KPL told Plexco to coat and ship all but 59,981 feet of the pipe. Plexco followed these instructions and awaited further instructions from KPL regarding the remaining amount of the pipe.

By mid-August, KPL made full payment to Continental under the terms of their contract. Continental, however, failed to make any further payments to Interlake after making its initial $150,000 payment. It was not until late July 1976 that Interlake contacted Continental to enforce the more stringent credit terms it initially imposed. Although Continental indicated it would send $50,000 immediately and $150,000 within the month, neither sum was sent. On September 10, 1976, Interlake sent Continental a registered letter demanding payment, but Continental refused to accept it.

In a letter dated September 17, 1976, Interlake ordered Plexco to stop delivery on any remaining pipe. On September 20, Plexco notified KPL that it would comply with the stop order. On October 22, 1976, Continental filed a petition for bankruptcy and was later adjudicated a bankrupt.

The issue presented is whether Interlake could properly stop delivery and recover the pipe while it was in the possession of Plexco. The parties interpret section 2—705(1) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 2—705(1)) differently. Section 2—705(1) provides:

"The seller may stop delivery of goods in the possession of a

carrier or other bailee when he discovers the buyer to be insolvent * * * and may stop delivery of carload * * * or larger shipments of * * * freight when the buyer repudiates or fails to make a payment due before delivery * * *."

Interlake contends that under section 2—705(1), the goods do not have to be in the hands of a carrier or other bailee in order for the seller to stop delivery of a carload or larger shipment when the buyer repudiates or fails to make a payment which is due. We disagree. We believe that the "carrier or other bailee" language in the beginning of the section implicitly applies to carloads or larger shipments.

■■ The legislative intent of section 2—705 demonstrates that stoppage of larger shipments in noninsolvency situations must involve carriers or other bailees. Specifically, Uniform Commercial Code Comment 1 to section 2—705 states in part:

"1. Subsection (1) applies the stoppage principle to other bailees as well as carriers.

It also expands the remedy to cover the situations, in addition to buyer's insolvency, specified in the subsection. But *since stoppage is a burden in any case to carriers, and might be a very heavy burden to them if it covered all small shipments in all these situations, the right to stop for reasons other than insolvency is limited to carload * * * or larger shipments.*" (Emphasis added.) (Ill. Ann. Stat., ch. 26, par. 2—705, Uniform Commercial Code Comment 1, at 523 (Smith-Hurd 1963).)

Not only does this Comment demonstrate that the category of *bailees* was expanded to include more than just carriers, but it also shows the intent to allow the stoppage of only large shipments in order to promote commercial business practices. As the Comment indicates, the Code drafters were aware of the burden to carriers caused by stopping delivery in noninsolvency situations if the Code covered all shipments, including small ones. To avoid this economic hardship, only stoppage of large shipments involving carriers, and now bailees, is permitted. Clearly, the "carrier or other bailee" language must apply to the carload or larger shipments language if the legislative intent involving business practices is to make any commercial sense. Accord, 3 Williston on Sales §24-6, at 411-12 (4th ed. 1974).

The trial court found that Plexco was not a bailee for any party. Under Illinois law, a bailment is defined as[1]:

"[T]he rightful possession of goods by one who is not an owner. The characteristics common to every bailment are the intent to create a bailment, delivery of possession of the bailed items, and the acceptance of the items by the bailee. [Citation.] A bailment

---

[1] Bailment is not defined under the Code.

can be established by express contract or by implication, with the latter designated as implied-in-fact or implied-in-law. [Citation.]" *Berglund v. Roosevelt Univeristy* (1974), 18 Ill. App. 3d 842, 844, 310 N.E.2d 773, 775-76.)

In the instant case, we believe that the facts demonstrate that a bailment was created between Plexco and KPL.

■■ KPL and Plexco were in a contractual relationship. In the purchase order KPL submitted to Plexco, KPL directed Plexco to receive, unload, coat, and store the pipe. Plexco obeyed these instructions. Plexco also obeyed KPL's subsequent instruction to ship all but 59,981 feet of the 6 5/8" pipe. Moreover, Plexco even received KPL's permission to coat the incoming pipe rather than that in storage. KPL fully performed its contract with Plexco by paying for the coating of the pipe which was shipped to Kansas. The fact that Plexco was KPL's bailee seems evident even from Interlake's documents. Interlake's mill order, bills of lading, and invoices to Continental were all labeled "KPL c/o Plexco." All these facts clearly establish the requisite intent, delivery, and acceptance requirements of a bailment. The pipe was delivered to Plexco, as a bailee, with the expectation that it would be returned to the bailor, KPL. (*Cf. Nassar v. Smith* (1974), 21 Ill. App. 3d 462, 466-67, 315 N.E.2d 692, 695-96 (bailment established when automobile tires sent to a merchant for "whitewalling").) In sum, the facts establish that a bailment was created between Plexco and KPL.

■■ Interlake also contends that it had the right to stop delivery until the pipe reached Kansas because of the documents which designed "f.o.b." Meade, Kansas. However, the f.o.b. designation is not controlling here because Interlake's right to stop delivery was terminated under section 2—705(2) by the conduct of the parties. The actual conduct of the parties supersedes the f.o.b. designation.

Section 2—705(2) provides: "As against *such buyer* the seller may stop delivery until * * * (b) acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer * * *." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 26, par. 2—705(2)(b).) The "such buyer" language refers to section 2—705(1), and in particular here, to "the buyer [who] repudiates or fails to make payment due before delivery * * *." (Ill. Rev. Stat. 1975, ch. 26, par. 2—705(1).) In the present case, the buyer failing to make payment is, of course, Continental.[2]

---

[2] Although the seller's section 2—705(1) stop delivery right applies against the non-paying, repudiating, or insolvent buyer, section 2—705 is silent as to this right against subpurchasers. However, since Code Comment 1 to section 2—705 emphasizes that the seller's right is terminated if the goods are sent to a subpurchaser, we will decide Interlake's claim against KPL for the pipe.

■ Although the "such-buyer" language of section 2—705(2) refers to the repudiating, nonpaying, or insolvent buyer of section 2—705(1), the subsections of section 2—705(2) give a broader meaning to the term "buyer." Specifically, under section 2—705(2)(a), the stop delivery right can be exercised until "receipt of the goods by the buyer." Official Code Comment 2 explains that this phrase

> " * * * *includes receipt by* the buyer's designated representative, *the subpurchaser*, when shipment is made direct to him and the buyer himself never receives the goods. *It is entirely proper* under this Article *that the seller, by making such direct shipment to the sub-purchaser, be regarded as acquiescing in the latter's purchase and as thus barred from stoppage of the goods as against him.*" (Emphasis added.) (Ill. Ann. Stat., ch. 26, par. 2—705, Uniform Commercial Code Comment 2, at 523 (Smith-Hurd 1963).)

Thus, for shipments sent to a subpurchaser, the drafters of the Code distinguished between the usual two-party seller-buyer transaction and that involving three or more parties. In the latter case, the seller's stop delivery right is barred because it acquiesces in the subsequent purchase by making direct shipment to the subpurchaser. See Bender, §13.04[2][b], at 13-52; 2 Anderson on the Uniform Commercial Code §2—705.6, at 360, 361 (2d ed. 1971 & 1978 Supp.)

The rationale behind this broader interpretation of buyer in section 2—705(2)(a) is also applicable, we believe, to the "acknowledgment to the buyer by the bailee" language of section 2—705(2)(b). Although the Code comments do not specifically address this point, it would be incongruous to permit the termination of the seller's stop-delivery right when the subpurchaser has received the goods, but not when they have been received by the bailee and acknowledged as such to the subpurchaser. Because a three-party transaction is involved here, the appropriate acknowledgment by the bailee, Plexco, would be made to the subpurchaser, KPL, rather than the original buyer, Continental.

■■ In the instant case, notification and thus the necessary acknowledgment (see Bender, §13.04[2][a], at 13-51, 13-52) from Plexco to KPL was made under section 2—705(2)(b), thus terminating Interlake's right to stop delivery. Specifically, the contract and preceding negotiations notified Plexco that KPL owned the goods. The contract provision setting forth that Plexco was to receive, unload, coat, and reship the pipe also shows that the goods belonged to KPL. The shipping documents were labeled "KPL c/o Plexco," which further showed that the pipe belonged to KPL. By adhering to KPL's subsequent instructions as to the coating and shipping of the pipe, and in holding the pipe for more than two months subject to those instructions, there was further acknowledgment by Plexco that it held the goods for KPL. In sum, there was acknowledgment

by Plexco to KPL under section 2—705(2)(b). As a result of this acknowledgment, Interlake's right to stop delivery of the goods while they were at Plexco was terminated.[3]

In this case, the subpurchaser, KPL, has paid for the goods and has not repudiated its contract with Continental. There is no valid reason why KPL should be prejudiced because of the relationship between Continental and Interlake. This conclusion is supported by Bender, §13.04[2][b], at 13-52, wherein it is stated:

"The subpurchaser may well have paid or be in a position to pay for the goods to his seller, who is the buyer from the seller in question, and he, the subpurchaser, may be in a position where he has not in any way repudiated the contract, nor is he insolvent. Accordingly, there is no real reason why he should be prejudiced because of any relationship between the original buyer and seller of these goods."

Moreover, Interlake took the risk of extending credit to *Continental* by sending the goods to KPL. Here, Interlake could have required that the goods be sent to Continental directly rather than to KPL. (See Bender, §13.04[2][b], at 13-52, 13-53.) Alternatively, Interlake could have shipped the goods C.O.D. to Continental because of the latter's doubtful credit status. (See Ill. Ann. Stat., ch. 26, par. 2—705, Uniform Commercial Code Comment, at 523 (Smith-Hurd 1963).) Instead, Interlake imposed more stringent credit terms on Continental, but then neglected to enforce them after shipping the pipe to the subpurchaser's bailee. In multiple transactions such as the instant one, it has been said that:

"If * * * the intermediate buyer-seller is the one who becomes insolvent, it would be a monstrous result, from the standpoint of fairness between the parties, to permit the original seller, who knew all the inter-relations of the deal from the outset, to appropriate for the payment of his claim against the buyer-seller the goods which now belong to the ultimate buyer: *it would be a case of permitting the taking of one man's goods to pay another man's debt.*" (Emphasis added.) (Whitney, The Law of Modern Commercial Practices §148, at 200 (2d ed. 1965 and 1979 Supp.).)

Here, it would be unfair to permit Interlake, who knew all the

---

[3] We recognize that if a bailee held the goods as a "mere intermediary or link in transit" (Williston, §24-6, at 411), the seller's right to stop delivery would not be foreclosed. In the instant case, however, Plexco received, unloaded, and set aside the pipe, following the written and verbal directions of KPL. Moreover, Plexco held the pipe for more than two months before the stop order was received. Under these facts, Plexco could not be labeled "a mere intermediary or link in transit." (*Cf. Donnegal Steel Foundry Co. v. Accurate Products Co.* (3d Cir. 1975), 516 F.2d 583, 590.) Similar to the mere intermediary concept, we recognize that the seller's right to stop goods in transit once they have left the possession of a bailee such as Plexco may involve other considerations not present in this case.

interrelations of the deal from the outset, to appropriate for the payment of its claim against Continental, the pipe which now belongs to the ultimate buyer, KPL. It would be a case of permitting the taking of KPL's goods to pay Continental's debt to Interlake.

We conclude that Interlake was not entitled to stop delivery of the pipe under section 2—705(1) because Interlake's right was terminated by Plexco's acknowledgment to KPL that Plexco was holding the pipe for KPL. (Ill. Rev. Stat. 1975, ch. 26, par. 2—705(2)(b).) Accordingly, the judgment in favor of Interlake is reversed. Judgment is entered in favor of KPL on the counterclaim. The case is remanded to the trial court for further proceedings including the question of damages.

Reversed and remanded.

SIMON, P. J., and McNAMARA, J., concur.