**MAREMONT CORPORATION, Plaintiff,**

**v.**

**HOESCH AMERICA, INC., Defendant.**

**No. 82–CV–3118–DT.**

United States District Court,
E.D. Michigan, S.D.

June 30, 1987.

---

Carl Rashid, Jr., Detroit, Mich., for plaintiff.

James J. Walsh, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

WOODS, District Judge.

This matter is before the Court on remand from the United States Court of Appeals for the Sixth Circuit pursuant to its opinion of September 12, 1986, 803 F.2d 720. This Court has been directed to make the following determinations:

1. Did Maremont's seller, USP, have constructive possession of the steel in question?

2. Was Maremont a buyer in the ordinary course?

3. Was Hoesch a bailor with respect to the steel in the warehouse of the processors at the time it reclaimed the steel?

4. If so, were Hoesch's rights as a bailor superior to Maremont's rights as a buyer in the ordinary course?

At issue are rights in steel stored at two processor/warehouses on October 30, 1980.[1] The locations, sizes and amounts of the steel were:

| | LOCATION | |
| --- | --- | --- |
| TYPE | Michigan Screw Products | Paterson Heat Treat |
| 9/16 C–1541 Rod | 106,058 lbs. | 25,410 lbs. |
| 21/32 C–1541 Rod | 338,242 lbs. | 142,650 lbs. |
| Total | 444,300 lbs. | 168,060 lbs. |

The facts have been set out at length both in this Court's Memorandum Opinion and in the Court of Appeals' decision, and only those facts directly bearing on the above issues which need emphasis or clarification will be repeated here.

## I. DID USP HAVE CONSTRUCTIVE POSSESSION OF THE STEEL?

On August 9, 1979, Hoesch and Paterson Heat Treat agreed that Hoesch would ship steel to be held in storage by Paterson in Hoesch's name for the account of USP until Hoesch authorized its release from storage. Sales confirmations dated August 8, 1979, contained that same condition. Exhibit 34. (One of these was signed by Michael Heitchue, Controller at USP at that time, on August 20, 1979, in acceptance; the other was not.) Judy Cocking, Sales Coordinator at Hoesch at the time, testified that these sales confirmations included all the steel held by Paterson Heat Treat on October 30, 1980. Nothing was offered to contradict that testimony. The sales confirmations provided that the steel included on those documents were to be shipped to Paterson Heat Treat during August and September, 1979. Paterson Heat Treat sent receiving reports to Ms. Cocking

---

1. The Court of Appeals affirmed this Court's judgment for plaintiff as to the 9,403 pounds of steel which had actually been delivered to USP prior to Hoesch's repossession and sale.

during September, 1979, which covered all the shipments of the type of steel at issue here which were still on hand on October 31, 1980. Exhibits 62N–P and 62A.

On the other hand, Maremont now contends that the agreement between Hoesch and Paterson Heat Treat was not arrived at until "more than one month *after* the last delivery of the steel in question." Plaintiff's Supplemental Findings of Facts and Conclusions of Law at 2 (emphasis in original). In support of that proposition Maremont offers the finding in the original opinion of this Court that the steel had all been invoiced to Marwil by USP by June 28, 1979. That finding is supported by the facts. In addition there was testimony by Michael Heitchue that steel was not entered on inventory cards at USP until after a receiving report was received from the processor. The steel in question was all entered on an inventory card at USP by July 1, 1979. Exhibit 29.

Maremont also notes William Grant's testimony that there "probably" was some steel of USP's on hand at the time the agreement was signed. Transcript at 222. There was no evidence, however, to link any such steel to the steel on hand on October 30, 1980.

■ The Court has weighed this conflicting evidence and has determined that it is more likely than not that the steel was received at Paterson Heat Treat *after* the agreement. USP should have had receiving reports in its possession showing the date on which the steel was received by Paterson Heat Treat, according to the testimony of Michael Heitchue. The only receiving reports in evidence, however, show that the steel was not received at Paterson Heat Treat until after the agreement was signed. This is consistent with the sales confirmations sent by Hoesch to USP. It is more plausible that the dates of entry on the inventory card at USP were in error or

reflect some event other than receipt of the steel by Paterson Heat Treat than that both the receiving reports and sales confirmations were in error. Therefore, the Court has determined that USP did not have constructive possession of any of the steel in issue in this case which was sent to Paterson Heat Treat.

On or before October 30, 1978, Michigan Screw Products agreed that it would not release any amount of the steel purchased by Hoesch from steel mills for the account of USP without a release from Hoesch. This agreement was extended on April 3, 1979, and was in effect during the purchases in question. The testimony was uncontradicted that this process was followed, and that the release was more than a ministerial act.

There is no evidence that either Paterson Heat Treat or Michigan Screw Products ever "acknowledged to the buyer ... [that the goods were held] for the buyer." See § 2–705(2)(b).[2]

Therefore, the Court finds that USP never had constructive possession[3] of the steel stored at either Paterson Heat Treat or Michigan Screw Products nor were Hoesch's rights to stop delivery cut off by operation of § 2–705(2)(b).

## II. WAS MAREMONT A BUYER IN THE ORDINARY COURSE?

■ The issue is whether it is necessary for a buyer's seller to have actual or constructive possession of the goods in question before the buyer can be a buyer in ordinary course. Neither the parties nor the Court have been able to find any cases which directly address this point, although there has been extensive consideration of the issue as to whether or not the *buyer* must have possession to be a buyer in ordinary course. See *Big Knob Volunteer Fire Company v. Lowe & Moyer Garage,*

---

2. For the sake of convenience all references to §§ 440.1101 *et seq.* are expressed in their Uniform Commercial Code (UCC) form, *viz.*, § 2–705 instead of § 440.2705.

3. "The act or state of possessing is a condition *of facts under which one can exercise power over property at his pleasure to the exclusion of* all other persons and a constructive possession is assumed to exist where one claims to hold by virtue of some title without its actual detention or custody." *Integrity Insurance Co. v. Marine Midland Bank-Western,* 90 Misc.2d 868, 396 N.Y. S.2d 319, 22 UCC Rep. 391, 393 (1977).

*Inc.*, 338 Pa.Super. 257, 487 A.2d 953, 957–59 (1985). This Court agrees with the Court in *Big Knob* (as does, indeed, the Sixth Circuit, at least implicitly, in affirming this Court's award of damages with regard to the steel in the possession of USP at the time it was sold by Hoesch) which holds that identification of the goods to the contract is the critical moment that determines when a buyer becomes a buyer in due course. *Id.* at 958.

In all of the cases cited by Maremont the seller *did* have possession of the goods at issue. Maremont argues that "once the steel arrived at the processors it was essentially in the 'back yard' of USP." Plaintiff's Supplemental Findings of Fact and Conclusions of Law at 6. The case cited by Maremont in support of that argument holds that a paper goods supplier who had delivered paper goods on consignment to a warehouse facility operator in the business of selling such goods did not have a right to the goods as against a creditor of consignee with a perfected security interest in the goods. *Georgia-Pacific Corporation v. Walter E. Heller & Company Southeast, Inc.*, 440 So.2d 666 (Fla.App. 1st Dist. 1983). In that case after the warehouse facility shipped the goods to buyers which it procured the supplier billed the buyer directly. The Code section at issue in *Georgia-Pacific*, therefore, is not any of the ones at issue in this case, but rather § 2–326(3), which provides that:

> Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return....

Here, however, there is no evidence that Paterson Heat Treat or Michigan Screw Products sold steel, and, indeed, the evidence is uncontroverted that Hoesch sold the steel to USP, who in turn sold it to Maremont. Nor has there been any evidence which suggests that Michigan Screw Products was a business maintained by USP. Therefore, the Court fails to see any credible argument which can be made on the basis of *Georgia-Pacific* which is relevant to this case.

One case cited by Hoesch analyzes what is necessary under § 2–403(1) before a buyer can prevail as a good faith purchaser over a seller seeking to stop delivery. *Ceres v. ACLI Metal & Ore Co.*, 451 F.Supp. 921, 925 (N.D.Ill.1978). "Without attornment by the bailee to the buyer, the zinc was never delivered to the buyer, and without delivery, the buyer did not obtain power under 2–403 to confer good title upon the bona fide purchaser...." *Id. Ceres* appears to regard § 2–705(2)(b) as the Code definition of attornment.[4] See *id.* at fn. 2. That section provides that the seller's right to stop delivery continues until, among other things, "acknowledgement to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer...." § 2–705(2)(b).

This Court regards this interpretation as correct, and the analysis by the *Ceres* court with regard to the necessity for attornment before the buyer obtains the power to confer good title upon a bona fide purchaser as fully applicable to a buyer's right to confer good title on a buyer in ordinary course. This conclusion is strengthened by the language in Official Comment 1 to § 9–307 which refers to § 2–403 as the source of general rules on "purchase of goods from a seller with defective or voidable title." In addition to the section referring to the rights of a bona fide purchaser, that section provides:

> (2) Any entrusting of possession of goods to a merchant who deals with goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
>
> (3) 'Entrusting' includes any delivery and any acquiescence in retention of possession....

---

4. Attornment originally meant "a turning over or transfer by a lord of the services of his tenant to the grantee of his seigniory." Black's Law Dictionary, Fifth Ed. It is now widely used as equivalent to § 2–705(2)(b), i.e. an acknowledgement by a bailee to a buyer that he is holding goods for him. See, e.g., 2 R. Anderson, *Uniform Commercial Code*, § 2–705:24 at 369 (2d ed. 1971).

Thus delivery is also required for the second method provided by which someone may get good title from someone with voidable title.

Maremont argues that attornment did occur, but relies solely on the evidence presented by William Grant of Paterson Heat Treat "that he always sent USP a copy of the bill of lading and a receiving report to advise USP that the steel had been delivered." Plaintiff's Supplemental Findings of Fact and Conclusions of Law at 6. As noted above, the only receiving reports in evidence from Paterson Heat Treat were addressed to Hoesch. Maremont cites no evidence, nor does this Court recall any, which specified the procedure used by Michigan Screw Products. Even were USP so advised, however, "to advise USP that the steel had been delivered" is not sufficient to serve as acknowledgement that the goods are being held for the buyer, as required by § 2–705(2)(b). The testimony is undisputed that Michigan Screw Products, Hoesch and USP all understood that when the steel was delivered it could not be released to USP without the approval of Hoesch. No evidence of any notification to USP suggesting the contrary has been offered. There is no evidence to support a finding that any such acknowledgement was made.

Therefore, the Court finds that there was no attornment, no delivery, and no conferring of title on Maremont. Thus the Court holds that Maremont did not attain the status of a buyer in ordinary course.

Thus, the protection of § 9–307(a) is unavailable to Maremont, and Hoesch's rights as the holder of a perfected security interest in the steel are superior to any rights of Maremont in the steel.

### III. WAS HOESCH A BAILOR?

■ Although the Court's determination of the two preceding questions make it unnecessary to determine the remaining two, the Court will address the issues involved.

Maremont argues that because the processors were not in the business of storing steel, but rather were in the business of processing steel, they are not entitled to the protection of § 2–705. In support of this argument they point out that Paterson Heat Treat did not charge storage fees. The evidence is clear, however, that Michigan Screw Products did charge storage fees on steel which they stored, but did not process. This included all of the steel in question. Regardless of that, Maremont has not identified any authority which would require either that a bailee be solely in the business of storing materials, or charge fees for such storage before § 2–705 applies.

Other courts determining whether a party is a bailor under this section have turned to general state law to determine whether a bailment has been created. *Interlake, Inc. v. Kansas Power and Light Company,* 79 Ill.App.3d 679, 34 Ill.Dec. 954, 398 N.E.2d 945, 948 (Ill.App.Ct.1979), *H. Lynn White, Inc. v. Leftwich,* 2 Kan.App.2d 341, 579 P.2d 164 (1978). In Michigan the term bailment means "the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished or the bailor claims it." *National Ben Franklin Insurance Company v. Bakhaus Contractors, Inc.,* 124 Mich.App. 510, 512 fn. 2, 124 Mich.App. 510 (1983) (citations omitted). The specific agreements between the processors and Hoesch made it clear that the processors were holding the steel for Hoesch until Hoesch released it, and there is little doubt that Hoesch was a bailor until the release was effectuated. At that point the processors "duly accounted for" the steel when they released it to USP in accord with Hoesch's directions. In the case of the steel which is at issue here, of course, it was never released to USP and was returned to Hoesch. The Court finds that Hoesch was a bailor of the steel.

### IV. WERE HOESCH'S RIGHTS SUPERIOR TO MAREMONT'S?

Assuming that Maremont were found to be a buyer in ordinary course and Hoesch a

bailor, the issue would remain as to whether or not Hoesch's rights were superior to Maremont's. The Court finds that this question is answered by *In re Murdock Machine & Engineering Co.*, 620 F.2d 767 (10th Cir.1980), a case which is directly on point and, although not binding on this Court, is very persuasive.

■ The Court is persuaded, its earlier opinion notwithstanding, that the lapse of time between Hoesch's discovery of USP's insolvency and its seizure of the goods does not impair its right to stop those goods in transit under § 2–705 until "the goods have come into the buyer's actual or constructive possession." *Murdock* at 773. As discussed above that did not happen with respect to the steel at issue in this case. Therefore, the lapse of time does not impair their right to stop the goods. *Compare* § 2–702(2) which provides that a seller's right to *reclaim* goods received by an insolvent buyer must be exercised within ten days of the seller's discovery of insolvency.

Similarly, *reclamation* rights are subject to the rights of a buyer in ordinary course. § 2–702(3). The *Murdock* court found that the lack of such a provision in § 2–705 means that such protection is not intended with respect to the right to stop goods in transit. *Murdock* at 774. This decision is consistent with *Ceres* which found that the specification of four events in § 2–705(2) which terminated the seller's right to stop goods was exclusive, and that a fifth condition—buyer's resale to a bona fide purchaser—should not be added by implication. *Ceres* at 924–25.

Therefore, IT IS HEREBY ORDERED that defendant Hoesch be ORDERED TO PAY plaintiff Maremont $902.69 for the steel in USP's possession at the time it was seized by Hoesch. IT IS FURTHER ORDERED that all other claims be DISMISSED for the reasons discussed above.

So ordered.