In re **TRICO STEEL COMPANY, L.L.C.**, Debtor.

**Cargill Incorporated, Plaintiff,**

v.

**Trico Steel Company, L.L.C., Defendant.**

Bankruptcy No. 01–1095 (MFW).
Adversary No. 01–772(MFW).

United States Bankruptcy Court, D. Delaware.

Aug. 28, 2002.

Philip Trainer, Jr., Christopher S. Sontchi, Ashby & Geddes, Wilmington, DE, for Cargill, Incorporated.

Michael R. Nestor, Curtis J. Crowther, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Trico Steel Co., LLC.

Adam G. Landis, Kathleen P. Makowski, Klett Rooney Lieber & Schorling, Wilmington, DE, William T. Russell, Jr., Eric M. Albert, David H. Orr, Simpson Thatcher & Bartlett, New York City, for JPMorgan Chase.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Motion of Cargill Incorporated ("Cargill") for Summary Judgment and the Joint Cross–Motion of Trico Steel Company, L.L.C. ("Trico") and JPMorgan Chase Bank ("Chase") for Summary Judgment. For the reasons set forth below, we grant the Motion of Cargill and deny the Cross–Motion of Trico and Chase.

## I. BACKGROUND

On January 24, 2001, Trico and Cargill entered into a contract for the sale of approximately 35,000 metric tons of basic pig iron. Cargill purchased the pig iron from Irontrade, Ltd. in Brazil and then arranged for carriers to ship it from Brazil to Trico in New Orleans, Louisiana.

On February 21, 2001, Trico entered into an agreement with Celtic Marine Corporation ("Celtic") to arrange for barge transportation of the pig iron from New Orleans to Trico's facility in Decatur, Alabama ("the Celtic/Trico Agreement"). Celtic in turn contracted with Volunteer Barge & Transportation ("Volunteer") to transport the pig iron from New Orleans to Decatur. The Celtic/Trico Agreement provided that Trico was responsible for loading the goods in New Orleans and unloading the goods when they arrived in Decatur and that Volunteer would be liable for any loss or damage to the goods during the barge transportation. (Trico/Chase's Exh. 5 at ¶ 4.) The Celtic/Trico Agreement also provided that Trico was responsible for payment of freight charges, irrespective of Trico's ownership interest in the goods or whether Trico had arranged the barge transportation of the goods on behalf of another entity or individual. (Id.)

After the pig iron arrived in New Orleans, approximately 10,000 tons were resold by Trico to Primetrade. On March 7, 2001, the remaining 25,000 tons of pig iron were loaded by stevedores onto barges for transport to Decatur. Volunteer issued two non-negotiable, straight bills of lading to Celtic as a receipt for the pig iron.

While the pig iron was in transit to Decatur, Cargill learned that Trico was insolvent. On March 23, 2001, Cargill sent Celtic a letter informing them that Cargill was exercising its right to stop the goods in transit. (Stipulation of Facts, Exh. 1–C.) On March 26, 2001, Cargill notified Trico that it was exercising its right to stop delivery of the pig iron in transit due to Trico's insolvency. (Id. at Exh. 1–D.)

On March 27, 2001, Trico filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On March 28, 2001, Cargill sent another letter to Celtic, agreeing to indemnify Celtic for any losses incurred in complying with Cargill's request to stop delivery of the pig iron. (Id. at Exh. 1–E.) On March 29, 2001, Cargill reiterated to Trico that it was exercising its right to stop delivery of the pig iron and that any action taken by Trico in contravention of Cargill's rights was prohibited. (Id. at Exh. 1–F.) The letter further stated that in the event that Trico had taken delivery of the pig iron, Cargill was exercising its right to reclaim the pig iron under applicable state law as well as under the Bankruptcy Code. (Id.) Cargill demanded that Celtic and Volunteer provide adequate assurance that they would comply with its directions. They in turn requested that Cargill seek judicial relief.

On March 30, 2001, Cargill filed the instant adversary proceeding seeking a de-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

claratory judgment, a temporary restraining order and a preliminary injunction prohibiting Trico from using, transferring, selling, encumbering or otherwise disposing of the pig iron. On April 18, 2001, we approved a stipulation between Cargill and Trico which resolved the Motion of Cargill for a Preliminary Injunction. Pursuant to that stipulation, the parties agreed that the pig iron would be sold to a third party and the proceeds held in escrow. Cargill subsequently sold the pig iron for $3,066,114.69, less expenses of $326,369.95. The remaining funds were transferred into escrow, pending a decision by the Court.

On September 28, 2001, Trico and Chase filed an Answer to the Complaint. On October 3, 2001, the parties entered into a stipulation permitting Chase to intervene in this adversary proceeding as a party-in-interest. Chase was a party to a security agreement with Trico dated November 30, 1995, pursuant to which Chase asserted a security interest in all of Trico's property. (Trico/ Chase's Exh. 6.)

On October 23, 2001, the parties filed a Stipulation of Facts. On February 2, 2002, Cargill filed a Motion for Summary Judgment. On March 1, 2002, Trico and Chase filed a Joint Cross–Motion for Summary Judgment. After responses and briefing, on June 18, 2002, we heard oral argument on the motions.

## II. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O).

## III. *DISCUSSION*

### A. *Motions for Summary Judgment*

To grant a motion for summary judgment, the court must determine if the moving party has established that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must assume that undisputed facts set forth in the record are true. *See, e.g., In re Trans World Airlines, Inc.,* 180 B.R. 386, 387 (Bankr.D.Del.1994); *Tanzer v. International General Industries, Inc.,* 402 A.2d 382, 386 (Del.Ch.1979).

### B. *Cargill's Right to Stop Delivery of the Pig Iron*

Cargill asserts that it rightfully stopped delivery of the pig iron in transit pursuant to sections 2–702 and 2–705 of the Uniform Commercial Code ("UCC"). As such, Cargill asserts that it is entitled to the funds held in escrow. Section 2–702(1) provides that:

> Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this Article (Section 2–705). N.Y.U.C.C. § 2–702(1). The seller may withhold and stop delivery of the goods until:
>
> (a) receipt of the goods by the buyer; or
>
> (b) acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer; or
>
> (c) such acknowledgment to the buyer by a carrier by reshipment or as warehouseman; or
>
> (d) negotiation to the buyer of any negotiable document of title covering the goods.

N.Y.U.C.C. § 2–705(2).

### 1. *"Receipt" of the Pig Iron*

The right to stop delivery of goods may be cut off by "receipt of the goods by the

buyer." N.Y.U.C.C. § 2–705(2)(b). The UCC defines " 'receipt' of goods as taking physical possession of them." N.Y.U.C.C. § 2–103(1)(c); *In re Marin Motor Oil, Inc.*, 740 F.2d 220, 225 (3d Cir.1984). Cargill asserts that Trico never received the pig iron because it never came into Trico's physical possession. Cargill asserts that it exercised its right to stop delivery before the pig iron reached Decatur, where Trico would have received physical possession. Cargill, therefore, argues that it properly exercised its right to stop delivery of the pig iron in transit before Trico received physical possession of the pig iron.

■ Trico argues, however, that it had actual, physical possession of the pig iron (*i.e.*, receipt) because it was responsible for unloading the pig iron in New Orleans and hired stevedores to do so. "Under general principles of law, the buyer's agent may be able to obtain actual possession of the goods for the buyer." *In re Maloney Enterprises, Inc.*, 37 B.R. 290, 294 (Bankr.E.D.Ky.1983). *See also* 4A Ronald A. Anderson, Anderson on the Uniform Commercial Code, § 2–705:46 (3rd ed. 1997) ("[T]he goods may be received by the buyer's agent or employee acting within the scope of the agent or employee's employment or authority"). Trico asserts that the stevedores were its agents. Additionally, Trico asserts that Cargill acknowledged this by referring to "your stevedores" in its letters and facsimile.

Cargill asserts that the stevedores unloading the pig iron did not effect receipt by Trico, because they were a mere intermediary or link in transit of the goods. *See, e.g., Donegal Steel Foundry Co. v. Accurate Products Co.*, 516 F.2d 583, 590 (3d Cir.1975) (the right to stop delivery of goods in the possession of a carrier or other bailee, exists when the goods are in the possession of a bailee who has undertaken to do more than "merely" hold or forward them); *Interlake, Inc. v. Kansas Power & Light Co.*, 79 Ill.App.3d 679, 34 Ill.Dec. 954, 398 N.E.2d 945, 950 n. 3 (1979) (if a bailee holds the goods as a mere intermediary or link in transit, the seller's right to stop delivery will not be foreclosed). We agree. The stevedores in this case, though hired by Trico, were to do nothing more than facilitate the transport of the pig iron. As such, the stevedores occupy no different position vis-á-vis Trico than did Celtic or Volunteer, who were also mere intermediaries in the transport of the pig iron.

■ Trico also argues that New Orleans was the place of final delivery and, once the pig iron arrived at New Orleans, Cargill's right to stop delivery ended. Trico asserts that this is evidenced by the shipping terms in the parties' agreement which stated that the pig iron was to be delivered to "Destination New Orleans CIFFO." Consequently, Trico argues that once Cargill delivered the pig iron to New Orleans, its right to stop delivery ended. Trico relies on Official Comment 2 to section 2–705 which states that "as between the buyer and the seller, the latter's right to stop the goods at any time until they reach the place of *final delivery* is recognized by this section." N.Y.U.C.C. § 2–705 cmt. 2 (emphasis added).

We conclude, however, that Trico misinterprets the comment to section 2–705. While the contract's shipping terms state "Destination New Orleans CIFFO" that merely expresses the responsibilities of the parties, vis-á-vis title and risk of loss. However, Trico did not intend for the pig iron to stay in New Orleans, as evidenced by its contract with Celtic to transport the pig iron to Decatur. Although Cargill delivered the pig iron to New Orleans, Trico was not to receive physical possession until the pig iron arrived at Decatur.

■ "Final delivery" as contemplated by the comment is synonymous with "receipt" under section 2–705(2)(a). The Official Comment to section 2–103(1)(c) highlights the distinction between "delivery" (when title passes) and "receipt" (when the seller's right to stop delivery ends):

> "Receipt" must be distinguished from delivery particularly in regard to the problems arising out of shipment of goods, whether or not the contract calls for making delivery by way of documents of title, since the seller may frequently fulfill his obligations to "deliver" even though the buyer may never "receive" the goods.

N.Y.U.C.C. § 2–103 cmt. 2. Therefore, "delivery" of the goods, where risk of loss and transfer of title pass to the buyer, does not necessarily constitute "receipt" of goods, which requires transfer of actual physical possession. *See, e.g., Marin,* 740 F.2d at 225; *In re Murdock Mach. and Engineering Co. of Utah,* 620 F.2d 767, 773 (10th Cir.1980) (passage of title does not eliminate or impair the seller's right to withhold and stop delivery of goods); *In re Nevins Ammunition, Inc.,* 79 B.R. 11, 16 (Bankr.D.Idaho 1987) ("whether a contract is a 'shipment' contract or a 'destination' contract is of little or no consequence or relevance to a stoppage in transit discussion"); *In re Pester Refining Co.,* 66 B.R. 801, 810–11 (Bankr.S.D.Iowa 1986).

The Third Circuit case of *Marin* is analogous to this case. In *Marin,* a commercial barge operated by a common carrier picked up gasoline from the seller's terminal and transported it to a terminal where the buyer had storage rights. The barge arrived at the latter terminal on April 10, but the gasoline was not unloaded into the storage facility until the following day, April 11. On April 21, the same day the buyer filed for chapter 11, the seller transmitted by telex a demand for reclamation

of the gasoline. The *Marin* Court observed that section 2–705:

> views *goods given by a seller to a common carrier for delivery to a buyer as being in the possession of the common carrier not the buyer,* and gives the seller the right to stop delivery of the goods upon discovery of the buyer's insolvency. This right to stop delivery applies regardless of which party bears the risk of loss, and regardless of which party is deemed to have 'title' to the goods while they are in the carrier's possession.

*Id.* at 225 (emphasis added). The *Marin* Court concluded that the date of "receipt" of the gasoline by the buyer was April 11, when the buyer's bailee took actual physical possession of the gasoline from the carrier. *Id.* at 226.

This case is similar. Although the pig iron was in physical possession of the stevedores and Volunteer, it never came into the physical possession of Trico. The pig iron was still in transit when Cargill exercised its right to stop delivery. Although title may have passed to Trico pursuant to the terms of the contract, those terms did not transfer actual physical possession of the pig iron to Trico.

Trico relies on the Third Circuit decision in *Donegal,* which held that:

> The destination contemplated by [seller] and [buyer], as evidenced by their contract, was [a third party]'s place of business. This was reached. Thus, [the third party]'s receipt of goods for the purpose of further processing and final delivery [to the buyer] ... under a new and distinct contract would usually be considered a termination of the original transit.

*Donegal,* 516 F.2d at 590.

The *Donegal* case is consistent with Official Comment 2 to section 2–705 which provides that:

"Receipt by the buyer" *includes receipt by the buyer's designated representative, the sub-purchaser,* when shipment is made direct [sic] to him and the buyer himself never receives the goods. It is entirely proper under this Article that the seller, by making such direct shipment to the sub-purchaser, be regarded as acquiescing in the latter's purchase and as thus barred from stoppage of the goods as against him.

N.Y.U.C.C. § 2–705 cmt. 2 (emphasis added). However, we conclude that *Donegal* is distinguishable from the facts here. In *Donegal,* the buyer designated the third party as his representative to receive the goods on his behalf. Thus, the final delivery of the goods from seller to buyer was the third party's place of business. Here, there was no entity in New Orleans that was designated by Trico to effect a receipt of the pig iron on its behalf for further processing. Instead, the delivery at New Orleans was merely to an intermediary designated to transport the pig iron to Decatur.

Trico argues that the fact that it resold almost one-third of the pig iron once it arrived in New Orleans is further conclusive evidence of Trico's receipt of the pig iron at that time. Trico asserts that it would have been impossible for it to have resold the pig iron to Primetrade if Trico had not actually received the pig iron in New Orleans.

Cargill acknowledges that a direct shipment of goods to a sub-purchaser, instead of the buyer itself, terminates Cargill's right to stop those goods. *See, e.g., Butts v. Glendale Plywood Co.,* 710 F.2d 504, 505 (9th Cir.1983) (a re-routing of a shipment from a buyer to a subpurchaser upon the instructions of the buyer and without the knowledge of the seller constituted a re-shipment under section 2–705(2)(c)); *Donegal,* 516 F.2d at 590. Thus, Cargill

admits that once Primetrade received those goods, Cargill's right to stop delivery with respect to those goods ended. That is precisely why those goods are not in dispute.

■ However, Cargill argues that this does not change the fact that Trico never actually received the remainder of the pig iron which continued on its trek to Trico's Decatur plant. We agree. The fact that Trico sold some of the pig iron, paid stevedores to unload the remaining pig iron onto Volunteer's barges and the shipping terms contained in the contract with Cargill constitute, at best, evidence that title and risk of loss passed to Trico at New Orleans. These facts do not, however, constitute actual physical receipt of the remaining pig iron by Trico. Therefore, we conclude that Cargill's right to stop delivery of that pig iron was not terminated pursuant to section 2–702(2)(a).

### 2. *Acknowledgment to Trico by a Bailee*

The right to stop delivery of goods may be cut off by an "acknowledgment to the buyer by a bailee of the goods *except a carrier* that the bailee holds the goods for the buyer." N.Y.U.C.C. § 2–705(2)(b) (emphasis added). Cargill contends that neither Celtic nor Volunteer are bailees, nor did they make such an acknowledgment to Trico.

■ Cargill asserts that Volunteer is not a bailee but is instead a carrier. As a receipt for the pig iron, Volunteer issued two non-negotiable, straight bills of lading to Celtic, which acknowledged Volunteer as the "carrier." Furthermore, the Celtic/Trico Agreement and the Celtic/Volunteer Agreement clearly denominate Volunteer as a "carrier." (Cargill's Exh. A–87.) Further, Cargill asserts that Volunteer never acknowledged to Trico that it held the pig iron for Trico, as required by

section 2–705(2)(b). There was no communication of any kind between Volunteer and Trico concerning or relating in any way to the transportation of the pig iron. Therefore, we conclude that Volunteer is not a bailee but a carrier for purposes of section 2–705(2)(b).

■ Similarly, Cargill asserts that Celtic could not be considered a bailee because it does not meet the requirements of a bailment. A bailment does not arise until there is a delivery of the goods to the bailee and the bailee has exclusive possession of the bailed property, even as against the property owner. *See, e.g., Thyssen Steel Co. v. M/V Kavo Yerakas,* 50 F.3d 1349, 1354–55 (5th Cir.1995); *T.N.T. Marine Service, Inc. v. Weaver Shipyards & Dry Docks, Inc.,* 702 F.2d 585, 588 (5th Cir.1983); *Osborn v. Cline,* 263 N.Y. 434, 189 N.E. 483, 484 (1934) ("One of the essential elements of a bailment is that the property be taken into the possession of the bailee"); *Hutton v. Public Storage Management, Inc.,* 177 Misc.2d 540, 676 N.Y.S.2d 886, 886 (N.Y.App.Term 1998). Cargill asserts that Celtic never had physical possession the pig iron, but merely arranged for the barge transportation.

■ The Celtic/Trico Agreement describes the relationship between the parties, and the relationship was not that of bailor/bailee. Celtic is identified as the "seller" of services and Trico as the "buyer" of services. The Celtic/Trico Agreement provides that Celtic, the seller, "does not have exact knowledge of the quantity, quality, condition, contents, or value of the Goods." (Cargill's Exh. A–88.) Celtic was not responsible for the loading or unloading of the pig iron, and Volunteer was liable for any loss or damage and for delivery of the pig iron. Therefore, we conclude that Celtic was not a bailee for purposes of section 2–705(2)(b).

■ Cargill further asserts that even if Celtic was a bailee, the only evidence of communication between Celtic and Trico were the forwarding of schedules showing the positions of Volunteer's barges. This is insufficient to serve as acknowledgment under section 2–705(2)(b). *See, e.g., Maremont Corp. v. Hoesch America, Inc.,* 663 F.Supp. 876, 880 (E.D.Mich.1987) (a bailee informing the buyer that the goods had been delivered "is not sufficient to serve as acknowledgement [sic] that the goods are being held for the buyer, as required by § 2–705(2)(b)"). Therefore, we conclude that there was no acknowledgment of a bailee under section 2–705(2)(b) sufficient to terminate Cargill's right to stop delivery of the pig iron.

3. *Acknowledgment to Trico by Carrier by Reshipment or Warehouseman*

■ The right to stop delivery of goods may also be cut off by an acknowledgment to the buyer by a "carrier by reshipment or as warehouseman." N.Y.U.C.C. § 2–705(2)(c). Cargill asserts that neither Celtic nor Volunteer were "carriers by reshipment" or "carriers by warehousemen." The Court in *Pester Refining* has explained these terms:

Under pre-Code law it was well established that a carrier would terminate a seller's right to stop goods in transit when the carrier expressly or by implication entered into a new agreement, distinct from the original contract of carriage, to hold the goods for the buyer as his agent, not for the purpose of expediting them to the place of original destination pursuant to that contract, but in a new character, for the purpose of custody on the buyer's account and subject to some new or further order to be given to the carrier. Such a termination could occur only if the carrier and buyer agreed pursuant to a new contract.

*Pester Refining,* 66 B.R. at 812 (internal citations omitted).

Cargill argues that there is no evidence of a termination of the Celtic/Trico Agreement and a subsequent contract between Trico and Celtic or between Trico and Volunteer for storage of the goods.

We agree. We cannot conclude that there was a new contract of a truly different character from the original agreement to transport the pig iron, and therefore we conclude that subsection 2–705(2)(c) does not apply.

### 4. Negotiation of a Negotiable Document of Title

The right to stop delivery of goods may also be cut off by the "negotiation of a negotiable document of title." N.Y.U.C.C. § 2–702(2)(d). The pig iron was covered by two non-negotiable, straight bills of lading that Volunteer issued to Celtic. As such, Cargill asserts, and we agree, that there was no negotiable document of title covering the pig iron sufficient for section 2–705(2)(d) to apply.

Therefore, we conclude that Cargill properly exercised its right to stop delivery of the pig iron in transit.[2] Cargill has the right to withhold and stop delivery[3] of the pig iron except for full cash payment. N.Y.U.C.C § 2–702(1).

### C. Conflicting Interests of Cargill and Chase

■ Chase asserts that its security interest in the pig iron pursuant to Article 9

of the UCC is superior to Cargill's right to stop delivery of the pig iron under Article 2. Chase asserts that under section 9–113 of the UCC[4] an Article 2 security interest is subject to the priority rules of Article 9. Section 9–113 provides that:

A security interest arising solely under the Article on Sales (Article 2) or the Article on Leases (Article 2A) is subject to the provisions of this Article except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default by the debtor are governed (i) by the Article on Sales (Article 2) in the case of a security interest arising solely under such Article or (ii) by the Article on Leases (Article 2A) in the case of a security interest arising solely under such Article.

N.Y.U.C.C. § 9–113.

Chase asserts that Cargill's right to stop delivery is a security interest that arises under Article 2. It relies on the Official Comment to section 9–113 which provides that:

---

**2.** Cargill alternately asserts that it is entitled to the pig iron because it timely exercised its right to reclaim the goods under section 2–702 of the UCC and section 546(c) of the Bankruptcy Code. However, since we conclude that Cargill properly exercised its right stop delivery of the pig iron, this argument need not be considered.

**3.** "After an effective stoppage under this section the seller's rights in the goods are the same as if he had never made a delivery." N.Y.U.C.C § 2–705 cmt. 6.

**4.** The sale agreement between Cargill and Trico is governed by New York law, and Revised Article 9 of the UCC has been adopted in New York. However, section 9–702(c) provides that "Revised Article 9 does not affect an action, case, or proceeding commenced before Revised Article 9 takes effect." N.Y.U.C.C § 9–702(c). Revised Article 9 became effective on July 1, 2001. N.Y.U.C.C § 9–701. Since this adversary proceeding was commenced on March 30, 2001, Old Article 9 applies.

Under the provisions of Article 2 on Sales, a seller of goods may reserve a security interest (see, e.g., Sections 2–401 and 2–505); and in certain circumstances, whether or not a security interest is reserved, *the seller has rights of resale and stoppage under Sections 2–703, 2–705 and 2–706 which are similar to the rights of a secured party.* N.Y.U.C.C. § 9–113 cmt. 1 (emphasis added). Chase asserts that since the right to stop delivery is similar to the rights of a secured party, Cargill's right to stop delivery falls within section 9–113 and the rules of priority under Article 9. Chase further asserts that under the rules of priority under Article 9, Chase has a higher priority since it perfected its security interest before Cargill did.

We disagree with Chase's interpretation of section 9–113. That section states that only a "security interest" arising under Article 2 is subject to Article 9, not a "security interest" and something "similar to a security interest." The right to stop delivery under section 2–702(1) is not designated as a "security interest" anywhere in Article 2. Therefore, we conclude that under the plain language of section 9–113 Cargill's right to stop the pig iron in transit is not subject to Chase's Article 9 security interest. *See, e.g., Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) ("Recourse to the legislative history of [a provision] is unnecessary in light of the plain meaning of the statutory text").

Even if we were inclined to rely on the legislative history, the comment to section 9–113 does not support Chase's analysis. The rest of the comment to section 9–113 provides that "The use of the term 'security interest' in the Sales Article is meant to bring the interests so designated within this Article." N.Y.U.C.C. § 9–113 cmt. 1. That comment explicitly states that only

an interest which is a "security interest" under Article 2 is subject to Article 9. Therefore, although the right to stop delivery is "similar to" the rights of a secured creditor, it is not designated as a "security interest" under Article 2 and, therefore, is not subject to Article 9. As such, any rights that Chase may have vis-á-vis Cargill arise under Article 2.

Under Article 2, a third party's rights with respect to goods are governed by section 2–403. Section 2–403(1) of the UCC provides that a "purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased." N.Y.U.C.C. § 2–403(1). A creditor with a floating security interest in the debtor's inventory can be a good faith purchaser of those goods for purposes of section 2–403. *See, e.g., Primary Health Systems, Inc.,* 258 B.R. 111, 114 (Bankr. D.Del.2001) (absent bad faith, a holder of a prior perfected, floating lien on inventory is a good faith purchaser under the UCC); *In re Arlco, Inc.,* 239 B.R. 261, 267 (Bankr. S.D.N.Y.1999); *In re Victory Markets Inc.,* 212 B.R. 738, 742 (Bankr.N.D.N.Y. 1997).

Section 2–705(3) deals with priorities between good faith purchasers of goods from the buyer and the seller of those goods. The seller's right to reclaim goods is expressly subject to the rights of a good faith purchaser; however, the right to stop delivery is not. N.Y.U.C.C. § 2–705(3). *See, e.g., Crocker Nat'l Bank v. Ideco Div. of Dresser Industries, Inc.,* 839 F.2d 1104, 1109 (5th Cir.1988) (where the seller has the right to withhold and stop delivery of the goods, a non-paying buyer does not have a sufficient right in the collateral to enable him to transfer a security interest in them to a third party); *Murdock Mach.,* 620 F.2d at 774 (seller's refusal to deliver

goods in his possession to an insolvent buyer is not affected by intervention of third-party good-faith purchaser); *Ceres,* 451 F.Supp. at 925 (seller was not barred from stopping delivery of goods to bona fide purchaser of buyer). *Cf. Arlco,* 239 B.R. at 267 (the right to reclaim is subject to the rights of a good faith purchaser); *Victory,* 212 B.R. at 742 (same).

Chase asserts, however, that Trico had sufficient rights in the pig iron to grant it an interest superior to Cargill's. In support of its assertion, Chase relies on *Kunkel v. Sprague Nat'l Bank,* 128 F.3d 636 (8th Cir.1997) and *Hong Kong & Shanghai Banking Corp., Ltd. v. HFH USA Corp.,* 805 F.Supp. 133 (W.D.N.Y.1992). The *Kunkel* Court held that where goods were constructively delivered to the buyer, the bank's security interest attached. Constructive delivery occurred when the goods were identified in invoices and other transaction documents delivered to the buyer. 128 F.3d at 642. The Court held that such communication constituted an acknowledgment under section 2–705(2)(b). *Id.* at 643. We conclude, however, that *Kunkel* is distinguishable from the circumstances here because the *Kunkel* Court concluded that there was delivery of the goods to the buyer which terminated the seller's right to stop delivery. Here, Cargill stopped delivery of the pig iron in transit *before* delivery to Trico. Therefore, the *Kunkel* decision is not applicable.

The *Hong Kong* Court held that where the buyer had a considerable degree of control over the goods (even though the buyer did not take physical possession of the goods), the buyer possessed sufficient rights in the goods to grant a security interest. 805 F.Supp. at 142–43. In that case, the Court found that the seller had a "security interest" in the goods under Article 2, thus subjecting its rights to Article 9 under section 9–113. *Id.* at 144. As we

concluded above, Cargill does not have an Article 2 security interest, and, therefore, section 9–113 is not applicable. Thus, the *Hong Kong* decision is inapposite.

Revised Article 9 is consistent with our interpretation of Old Article 9. Official Comment 5 to Revised section 9–110 (former section 9–113) discusses the seller's right to withhold and stop delivery and states that:

> This Article does not specifically address the conflict between (i) a security interest created by a buyer or lessee and (ii) the seller's or lessor's right to withhold delivery under Section 2–702(1), 2–703(a), or 2A–525.... *These conflicts are governed by the first sentence of Section 2–403(1), under which the buyer's secured party obtains no greater rights in the goods than the buyer had or had power to convey.*

U.C.C. § 9–110 cmt. 5 (emphasis added).

With respect to a seller's right to withhold and stop delivery, commentators have interpreted Official Comment 5 as follows:

> To translate: the position of the Reporters for Revised Article 9 is that the buyer's secured creditor is a purchaser but gains a security interest only in the interest of the buyer. It is not that the buyer has no rights, but has insufficient rights to give a security interest that will defeat the seller's right to withhold or stop the goods. The buyer's secured creditor steps into the shoes of the buyer. Where the seller refuses delivery because of the buyers [sic] insolvency, the secured creditor could terminate the seller's right to withhold by making a cash payment for the goods just as the buyer may.

1A Peter F. Coogan, Secured Transactions Under the Uniform Commercial Code, § 7D.03[6][b], 7D–15 (Matthew Bender 2002). *See also* 9A William D. Hawkland,

Uniform Commercial Code Series, [Rev] § 9–110:1, pp. 550–52 (2000).

Therefore, we conclude that under the Old Article 9, a right to stop delivery is not subject to the rights of a secured creditor of a buyer. Therefore, Cargill's right to stop delivery of the pig iron is superior to the rights of Chase as a secured creditor of Trico.

## IV. CONCLUSION

For the foregoing reasons, Cargill's Motion for Summary Judgment will be granted, entitling it to the funds currently held in the escrow account, and Trico and Chase's Joint Cross–Motion for Summary Judgment will be denied.

An appropriate Order is attached.

### ORDER

AND NOW, this **28TH** day of **AUGUST, 2002,** upon consideration of Cargill Incorporated's Motion for Summary Judgment and Trico Steel Company, L.L.C. and JPMorgan Chase Bank's Joint Cross–Motion for Summary Judgment, and for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Motion of Cargill Incorporated for Summary Judgment is **GRANTED;** and it is further

**ORDERED** that the Joint Cross–Motion of Trico Steel Company, L.L.C. and JPMorgan Chase Bank for Summary Judgment is **DENIED;** and it is further

**ORDERED** that the funds held in escrow representing the proceeds of the sale of the pig iron shall be turned over to Cargill, Incorporated.